No. 92-536

IN THE SUPREME COURT OF THE STATE OF MONTANA

1995

STATE OF MONTANA,

     Plaintiff and Respondent,

  v.

BILL K. BULLOCK and
EDDIE J. PETERSON,

     Defendants and Appellants.

APPEAL FROM:    District Court of the Fifth Judicial District,
                 In and for the County of Jefferson,
                 The Honorable Frank M. Davis, Judge presiding.

COUNSEL OF RECORD:

     For Appellants:

          Paul B. Smith (argued), Attorney at Law,
          Boulder, Montana

     For Respondent:

          Hon. Joseph P. Mazurek, Attorney General,
          Chris D. Tweeten (argued), Assistant Attorney
          General, Helena, Montana

          Richard Llewellyn, Jefferson County Attorney,
          Deborah J. Butler, Deputy County Attorney,
          Boulder, Montana

FILED

AUG 04 1995

Filed: *Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted:  January 17, 1995

Decided:  August 4, 1995

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

The defendants, Eddie Peterson and Bill Bullock, were charged in Jefferson County Justice Court with unlawfully killing a game animal in violation of § 87-3-103, MCA, and possession of an unlawfully killed animal in violation of § 87-3-112, MCA. The Justice Court suppressed all of the State's evidence pertaining to Peterson, and dismissed the charges against Bullock. The State appealed to the District Court for a trial *de novo* pursuant to § 46-17-311, MCA. On appeal, the District Court denied the defendants' motions to dismiss and to suppress evidence. Peterson then pled guilty to unlawfully killing a game animal; Bullock pled guilty to unlawfully possessing a game animal; and both defendants reserved their right to appeal the District Court's order denying their motions to dismiss and suppress evidence pursuant to § 46-12-204(3), MCA. Following two orders by this Court which remanded this case to the District Court for further proceedings, we affirm the District Court's order which denied the defendants' motion to dismiss, and reverse the District Court's order which denied the defendants' motion to suppress evidence.

The issues presented on appeal are as follows:

1. Did the District Court err when it denied the defendants' motion to dismiss the charges against them pursuant to § 46-13-401(2), MCA, based on the State's failure to bring them to trial within six months from the date of their plea entry?

2

2.   Did defendant Bullock have standing to challenge the State's entry upon and search of land owned by Peterson?

3.   Does Article II, Section 11, of the Montana Constitution, prohibit warrantless searches and seizures, under the circumstances in this case, on private land that falls outside the curtilage of a dwelling?

### FACTUAL BACKGROUND

At about 6:30 a.m. on October 31, 1991, while returning home from work, Chuck Wing observed what he estimated was a large six or seven point antlered bull elk on Boulder Hill near Boulder, Montana.  He recognized that the elk was in Hunting District 380 where hunters were allowed to shoot only "spikes" unless they had a special permit.  As Wing observed the elk, he heard a gunshot, saw the elk fall, and observed two men and a boy standing near a pickup truck in the vicinity of the fallen elk.  He believed the pickup belonged to defendant Eddie J. Peterson.  He then observed the three people drag the elk to the truck and load it without field-dressing it.  Wing reported the incident to Jefferson County Sheriff Tom Dawson, who, in turn, relayed the information to Game Warden Chris Anderson, an employee of the Montana Department of Fish, Wildlife, and Parks.  Anderson traveled from Helena to Boulder that morning to investigate the incident.

Anderson first interviewed Wing who related the above information.  He then drove to Peterson's home in Boulder, but Peterson was not at home.  Anderson returned to the sheriff's

3

office where he learned that Peterson had a cabin in Basin Creek. Rather than try to give directions, Dawson agreed to accompany him to the cabin. To reach Peterson's cabin, it is necessary to travel approximately seven miles on a one-lane forest service road which is bounded by forest on both sides. At least one sign along that road indicates that the road is bordered by private property and advises the public to remain on the road.

Peterson's property is separated from the road by a fence. There is a gate which provides access to his property from the forest service road. "No Trespassing" signs are posted on trees on each side of the gate. His cabin is located at the end of a private road 334 feet from the forest service road. Between the forest service road and Peterson's cabin, the terrain is slightly elevated in a way that conceals Peterson's cabin and the other structures on his property. He moved his cabin beyond the hill at an earlier time so that it would not be evident to passers by.

When Anderson and Dawson reached Peterson's property, the gate was open. They entered the property through the gate and drove approximately 180 feet down Peterson's private road. As they descended the crest of the hill between his cabin and the forest service road, they first observed a large bull elk hanging from a tree in an area about 126 feet from Peterson's cabin. The elk could not be seen from the public road, nor was there evidence that it could be seen from any other public location. Peterson

4

testified that the elk was hanging between his cabin, several vehicles, and a guest sleeping cabin.

The parties agreed that, in the past, anyone who wished to enter Peterson's property or drive on his private road had called to ask permission. In fact, the Jefferson County Sheriff's Office had done so a few days earlier prior to conducting a search for lost hunters. On the date in question, neither Dawson nor Anderson asked or received permission to be on Peterson's property. Neither had they secured a search warrant, in spite of the fact that Anderson testified in Justice Court that he believed there was probable cause that a crime had been committed, that Peterson was involved, and that Peterson still possessed evidence of that crime.

At the hearing held in the District Court pursuant to the defendants' motion to suppress, there was disagreement about exactly what Anderson and Dawson did after observing the elk hanging near Peterson's cabin. However, in stipulations filed with the court earlier, the parties agreed that after observing the elk, Anderson and Dawson went over to examine it. After conducting the examination, Anderson then requested that Peterson take him and Dawson to the place where the elk was killed. Peterson did so, but at the site where the law enforcement officers were taken, there were no elk tracks--only a pile of the elk's entrails. It was apparent to Anderson that the elk had not been killed at that location.

5

Anderson then confronted Peterson with the information he had received from Wing. Peterson provided him with an explanation that ultimately was found to be inaccurate. Bullock was then questioned, provided responses consistent with Peterson's, and declined the State's offer of immunity in exchange for testimony that would incriminate Peterson.

The following day, Anderson returned to Peterson's cabin and confiscated the elk carcass.

On November 8, 1991, Peterson was charged in Jefferson County Justice Court with unlawfully killing a game animal in violation of § 87-3-103, MCA. Bullock was charged with possession of an unlawfully killed animal in violation of § 87-3-112, MCA. Both defendants pled not guilty to those charges on November 18, 1991. An amended complaint was filed on December 3, 1991, which included additional charges against Bullock. The defendants filed their initial appearance and pled not guilty to the amended complaint on December 18, 1991.

The charges against both defendants were set for trial on March 6, 1992. However, on January 22, 1992, the defendants moved to suppress all evidence obtained by the State as a result of Anderson's and Dawson's entry onto Peterson's property without a search warrant.

On February 28, 1992, the Justice Court granted the defendants' motion; it suppressed all evidence, whether verbal or physical "connected to the chain of events concerning Eddie

6

Peterson's case"; and it dismissed all charges against Bill Bullock.

On March 2, 1992, the State appealed to the District Court for the Tenth Judicial District in Jefferson County pursuant to § 46-17-311, MCA, and asked for trial *de novo*. On June 30, 1992, the defendants moved the District Court for an order dismissing the charges against them pursuant to § 46-13-401(2), MCA, because the offenses alleged were misdemeanors, and they had not been brought to trial within six months. In the alternative, the defendants renewed their motion to suppress all evidence that had been gathered by the State without the benefit of a search warrant.

On August 7, 1992, the District Court denied defendants' motions based on the facts which had been stipulated to by the parties. On August 26, 1992, the defendants pled guilty pursuant to § 46-12-204(3), MCA, while preserving their right to appeal the District Court's denial of their motions.

The defendants originally filed their notice of appeal on October 23, 1992. However, we have since remanded to the District Court for evidentiary proceedings and for imposition of sentence. Those proceedings have been completed. We now consider the merits of the issues raised on appeal.

ISSUE 1

Did the District Court err when it denied the defendants' motion to dismiss the charges against them pursuant to

7

§ 46-13-401(2), MCA, based on the State's failure to bring them to trial within six months from the date of their plea entry?

Peterson and Bullock contend that since they were charged with misdemeanor offenses, § 46-13-401(2), MCA, required that they be brought to trial within six months from the date of their initial appearance. They initially appeared on November 18, 1991, and trial was not scheduled in the District Court until August 26, 1992, which was more than six months later. They contend that our prior decisions in *State v. Knox* (1984), 207 Mont. 537, 675 P.2d 950, and *State v. Sunford* (1990), 244 Mont. 411, 796 P.2d 1084, are inapplicable because there was no trial in the Justice Court, and that instead, the result in this case is controlled by our decision in *State v. Ronningen* (1984), 213 Mont. 358, 691 P.2d 1348. The State responds that § 46-13-401(2), MCA, applies only to justice court and that there is no practical reason for distinguishing this case from *Sunford* based simply on the manner in which the cases were resolved in the Justice Court.

Whether the District Court properly denied the motion to dismiss is a legal issue which we review to determine whether the district court's interpretation was correct. *State v. Mantz* (Mont. 1994), 887 P.2d 251, 253, 51 St. Rep. 1527, 1528 (citing *Doting v. Trunk* (1993), 259 Mont. 343, 856 P.2d 536).

Section 46-13-401(2), MCA, provides that:

> After the entry of a plea upon a misdemeanor charge, the court, unless good cause to the contrary is shown, shall order the prosecution to be dismissed, with

8

prejudice, if a defendant whose trial has not been postponed upon the defendant's motion is not brought to trial within 6 months.

We held in *Ronningen* that the "speedy trial" test which is applicable in district court is not applicable to misdemeanors prosecuted in justice court, and that where a defendant has not requested a delay, the six month standard is the sole consideration for speedy trial analysis, absent good cause to hold otherwise. In that case we held that the retirement of the presiding judge did not constitute good cause for delay past six months. However, *Ronningen* was not concerned with the situation where charges are resolved in justice court and one or the other party appeals to the district court for a trial *de novo*. We first addressed the applicability of § 46-13-401(2), MCA, to that situation in *State v. Knox*. There, we held that where the defendant had received a trial in city court within six months from the date of his initial appearance, and then appealed to district court for a trial *de novo*, § 46-13-401(2), MCA, was inapplicable to the proceedings in district court, but that the time for conducting a trial in the district court is controlled by the criteria established in *Barker v. Wingo* (1972), 407 U.S. 514, 523, 92 S. Ct. 2182, 2188, 33 L. Ed. 2d 101, 112-13. We affirmed that rule in *Sunford*, and again in *Mantz*, 887 P.2d at 253 (citing *Doting*, 856 P.2d 536).

In *Mantz*, 887 P.2d at 253, we pointed out that "we have already interpreted this statute as inapplicable to those situations in

9

which the case comes from justice court to a trial de novo in district court."

We cited from *Sunford* for the principle that:

Once an action is appealed from justice to district court, it is treated as if it were a new trial. Questions regarding speedy trial in cases concerning new trials are analyzed under the constitutional standards of *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

*Sunford*, 796 P.2d at 1087.

The defendants contend, however, that a trial *de novo* infers a second trial and that there can be no trial *de novo* without a first trial. While that may be correct based on a strict definition of the term, it is not correct as the term is used in our statutes providing for trial *de novo* in district court. Section 46-17-311, MCA, provides that all cases appealed from a justice court to the district court must be tried anew, and that the prosecution may appeal under the circumstances provided for in § 46-20-103, MCA. That statute provides in relevant part that:

(2) The state may appeal from any court order or judgment the substantive effect of which results in:
(a) dismissing a case;
. . . .
(e) suppressing evidence . . . .

While this Court was not unanimous in its conclusion that § 46-13-401(2), MCA, does not apply to misdemeanor charges appealed to the district court (*see Mantz*, Justices Trieweiler and Hunt dissenting), all members do concur that for purposes of applying that rule there is no basis for distinguishing between cases

10

appealed after trial in the justice court and cases appealed from disposition in some other fashion in justice court. So long as the justice court jurisdiction is exhausted within six months by some action which authorizes appeal *de novo* to the district court, § 46-13-401(2), MCA, has been satisfied. For these reasons, we analyze the defendants' motion to dismiss based on the test established in *Barker v. Wingo*.

The *Barker* test requires courts to consider (1) the length of the delay; (2) the reason for the delay; (3) the assertion of the right to a speedy trial by the defendant; and (4) the prejudice to the defense. *Mantz*, 887 P.2d at 253 (citing *Barker*, 407 U.S. at 530).

When considering the first factor, the time for calculating the length of delay commences on the date that the State files its notice of appeal from justice court. *See State v. Nelson* (1991), 251 Mont. 139, 142, 822 P.2d 1086, 1088. In this case, the State filed its notice of appeal from the Justice Court on March 2, 1992. The District Court scheduled a trial for August 26, 1992, 176 days later. The defendants pled guilty on or before the date set for trial.

The length of the delay is of primary importance, and the other factors need not be considered unless the length of delay is presumptively prejudicial. *State v. Thompson* (1993), 263 Mont. 17, 32, 865 P.2d 1125, 1134-35 (citing *State v. Dahms* (1992), 252 Mont 1, 12, 825 P.2d 1214, 1220). In *Nelson*, we stated that a delay of less than

11

six months was not presumptively prejudicial. Likewise, we hold that the delay of 176 days in this case is not presumptively prejudicial under the facts in this case. Therefore, we will not address the other *Barker* criteria. We affirm the District Court's denial of the defendants' motion to dismiss.

### ISSUE 2

Did defendant Bullock have standing to challenge the State's entry upon and search of land owned by Peterson?

The State contends that Bullock has no standing to challenge the legality of the State's entry onto and search of Peterson's land because he had no ownership interest in that land. It contends that pursuant to this Court's recent decisions in *State v. Gonzales* (1988), 231 Mont. 242, 751 P.2d 1063, and *State v. Powers* (1988), 233 Mont. 54, 758 P.2d 761, a party must have some interest in the property searched before he or she can contest the admissibility of evidence gathered during the search.

Bullock responds that he was charged with possessing the elk carcass seized from Peterson's property, and that under our prior decisions, that possessory interest was sufficient to establish standing.

We agree that the State construes our prior decisions regarding standing too narrowly.

Even after the United States Supreme Court retreated from its "automatic standing" rule in cases where a defendant is charged with illegal possession of some item, in *United States v. Salvucci* (1980),

12

448 U.S. 83, 100 S. Ct. 2547, 65 L. Ed. 2d 619, we held that ownership of the property searched is not necessary to establish standing to object to the legality of a search. *State v. Isom* (1982), 196 Mont. 330, 641 P.2d 417. We stated:

> Notwithstanding the limitations placed on *Jones[v. United States* (1960), 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697], the Court in *Rakas[v. Illinois* (1978), 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387], and again in *Salvucci*, emphasized that ownership is not a key element in determining standing. The test for standing is not to be based on distinctions out of property and tort law: "In defining the scope of that interest, we adhere to the view expressed in *Jones* and echoed in later cases that arcane distinctions in property and tort law between guests, licensees, invitees, and the like ought not to control." See *Jones*, 362 U.S. at 266, 80 S.Ct. at 733; *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430; *Salvucci*, 448 U.S. at 91, 100 S.Ct. at 2553; and *Rawlings[ v. Kentucky* (1980)], 448 U.S. [98] at 105, 100 S.Ct. [2556] at 2561. The controlling view, then, seems to be that expressed in *Mancusi v. DeForte* (1968), 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154, in which the Court said that the *Katz* test of "'legitimate expectation of privacy' makes it clear that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place, but upon *whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion*." See *Mancusi*, 392 U.S. at 368, 88 S.Ct. at 2124.

*Isom*, 641 P.2d at 420.

Following this rationale, we concluded in *Isom* that a defendant who was a guest in his uncle's home at the time that it was searched had standing to object to the government search of that home, even though he had no ownership interest in the premises.

We have since held in both *Gonzales* and *Powers* that a possessory interest in either the premises searched <u>or the property seized</u> is

13

sufficient to establish standing. However, we have never modified nor reversed our position in *Isom*.

Other states which have held that a possessory interest in the items seized is sufficient to establish standing to challenge the legality of a search or the property's seizure, have adopted automatic standing rules on independent state grounds where the defendant is charged with unlawfully possessing that item.

For example, in *State v. Alston* (N.J. 1981), 440 A.2d 1311, the defendants were passengers in a vehicle from which weapons were seized during a search of the vehicle. They were later charged with unlawful possession of the weapons. Pursuant to the defendants' motion, the evidence was suppressed by the trial court, based on the illegality of the police search. On appeal, the state contended that the defendant passengers had no standing to challenge the legality of the search of the vehicle, despite their possessory interest in the weapons which had been seized.

After reviewing the U.S. Supreme Court's decisions on standing, including *Salvucci*, that court noted an inconsistency in the federal law which appeared to allow prosecutors to assert contradictory positions:

> [T]hat the defendant possessed the contraband property for the purposes of proving criminal liability, but that he had insufficient possessory interest in the property for the purposes of defending the legality of the search and seizure.

*Alston*, 440 A.2d at 1317. The court pointed out that a basic principle of American federalism confers on state courts the power

14

to afford citizens of each state greater protection against unreasonable searches and seizures than may be required by the Supreme Court's interpretation of the Fourth Amendment, and on that basis, concluded that the *Salvucci* decision afforded inadequate protection against unreasonable searches and seizures. *Alston*, 440 A.2d at 1318-19.

Finally, the New Jersey Supreme Court concluded that based on its rule of standing which provided that "a criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized," it would retain the automatic standing rule where a defendant is charged with an offense in which possession of the seized evidence at the time of the contested search is an essential element of guilt. *Alston*, 440 A.2d at 1320. It adopted reasoning from former Justice Thurgood Marshall that

> [t]he automatic standing rule is a salutary one which protects the rights of defendants and eliminates the wasteful requirement of making a preliminary showing of standing in pretrial proceedings involving possessory offenses, where the charge itself alleges an interest sufficient to support a Fourth Amendment claim.

*Alston*, 440 A.2d at 1320 (citing *Salvucci*, 448 U.S. at 97, 100 S. Ct. at 2556, 65 L. Ed. 2d at 632 (Marshall, J., dissenting)).

Other states have also adopted the rule of automatic standing for crimes of possession. *See State v. White* (Ariz. App. 1978), 574 P.2d 840; *State v. Alosa* (N.H. 1993), 623 A.2d 218.

15

We agree with the reasoning in *Alston*. Based on independent state grounds pursuant to Article II, Section 11, of the Montana Constitution, we hold that when the charge against the defendant includes an allegation of a possessory interest in the property which is seized, the defendant has standing to object to the prosecutorial use of that evidence based on either the unlawful search of the location where it was found, or its unlawful seizure.

Since Bullock was accused by the State of unlawfully possessing the elk carcass which was found on Peterson's property, we conclude, based on our prior decisions and the logical application of those decisions as set forth above, that he had standing to object to the State's search of Peterson's property and seizure of that carcass.

ISSUE 3

Does Article II, Section 11, of the Montana Constitution, prohibit warrantless searches and seizures, under the circumstances in this case, on private land that falls outside the curtilage of a dwelling?

We review a district court's conclusions of law regarding a motion to suppress to determine whether the district court's interpretation of the law was correct. *State v. Pastos* (Mont. 1994), 887 P.2d 199, 201, 51 St. Rep. 1441, 1442. The defendants contend that the elk discovered by the State pursuant to its warrantless entry onto Peterson's property, and any further evidence which resulted from the discovery of that carcass, including statements

16

made by both defendants, should be suppressed based upon the Fourth Amendment to the United States Constitution, and Article II, Section 11, of the Montana Constitution, which guarantee the defendants the right to be free from unlawful searches and seizures. As evidence that the State's entry upon Peterson's land and seizure of the elk carcass were unlawful, the defendants point out that no search warrant had been issued, that permission had not been given for Anderson and Dawson to enter Peterson's land, and that the search which led to discovery of the elk was not made pursuant to any statutory exception provided for game wardens at § 87-1-506(2), MCA. They contend that pursuant to *State v. Osteen* (1985), 216 Mont. 258, 261, 700 P.2d 188, 191, and *State v. Carlson* (1982), 198 Mont. 113, 119, 644 P.2d 498, 501, the plain view doctrine does not apply because the law enforcement officers were not legally at the place where they first observed the elk carcass; that pursuant to the criteria set forth in *United States v. Dunn* (1987), 480 U.S. 294, 301, 107 S. Ct. 1134, 1139, 94 L. Ed 2d 326, 334-35, the carcass was located in the curtilage of Peterson's home, rather than in the "open field" and that at that location defendants had a subjective expectation of privacy which should be recognized as reasonable by society.

The State responds that Anderson's presence on Peterson's property, and his observation of and subsequent seizure of contraband at that location, was constitutionally permissible pursuant to the "open fields" doctrine recognized by the U.S.

17

Supreme Court in *Oliver v. United States* (1984), 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214, and previously recognized by this Court in *State v. Charvat* (1978), 175 Mont. 267, 573 P.2d 660, and subsequent cases. The State also contends that the location of the elk carcass did not meet the criteria for constitutionally protected curtilage set forth in *Dunn*, and that pursuant to § 87-1-502(6), MCA, Anderson had the authority to inspect the carcass at any location other than a residence or dwelling.

The Fourth Amendment to the United States Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article II, Section 11, of the Montana Constitution, provides similarly that:

> The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

Pursuant to these provisions, searches conducted without warrants are presumed to be unreasonable subject to a few delineated exceptions. *Osteen*, 700 P.2d at 191 (citing *Katz v. United States* (1967), 389 U.S. 347, 357, 88 S. Ct. 507, 514, 19 L. Ed. 2d 576, 585). The State contends that a search of open fields was

18

either never intended for protection pursuant to these amendments, or is an exception to the warrant requirement, depending on which precedent is considered.

Because of what appear to be seeming inconsistencies in the decisions of the United State Supreme Court, our prior willingness to apply those decisions under circumstances which were different than those presented in this case, and contrary decisions in other jurisdictions based on the same high regard for privacy that prevails in this State, we deem it appropriate to trace the origins of the "open fields" doctrine, and reconsider its applicability to Article II, Section 11, of the Montana Constitution.

The open fields doctrine was first established in *Hester v. United States* (1924), 265 U.S. 57, 44 S. Ct. 445, 68 L. Ed. 898. In *Hester*, the Court held that the Fourth Amendment protects "persons, houses, papers, and effects," and is not extended to the open fields. *Hester*, 265 U.S. at 59 (citing 4 Bl. Comm. 223, 225, 226). Shortly thereafter, the Supreme Court clarified that the Fourth Amendment provides protection from invasion of one's house or curtilage. *Olmstead v. United States* (1927), 277 U.S. 438, 466, 48 S. Ct. 564, 568, 72 L. Ed 944, 951.

Subsequently, however, that Court recognized that the Fourth Amendment protects people--not places--from unreasonable searches.

19

*Katz*, 389 U.S. 347.[1]  In *Katz*, the Court stated that the Fourth Amendment protects individual privacy against certain kinds of government intrusion, but its protections go further and often do not relate to privacy.  *Katz*, 389 U.S at 350.  A person's right to privacy, or right to be let alone, is largely left to the law of the states.  *Katz*, 389 U.S. at 350-51.  What a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.  *Katz*, 389 U.S. at 351.  Finally, the Court discredited the previous notion that property interests control the government's right to search and seize.  *Katz*, 389 U.S. at 353.  However, the two-part test that this Court has followed since *Charvat* to determine whether a search is unlawful was set forth in Justice Harlan's concurring opinion in *Katz*, 389 U.S. at 361 (Harlan, J., concurring).  That test requires that (1) a person have an actual expectation of privacy; and (2) the expectation must be one society is willing to recognize as reasonable.

In a seeming return to concepts discredited in *Katz*, the Court reaffirmed notions grounded in *Hester* in *Oliver v. United States* (1984), 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214.  *Oliver* was based on two

---

[1]  Commentators have suggested that the Fourth Amendment protects people and places.  *See* Elison and NettikSimmons, *Right of Privacy*, 48 Mont. L. Rev. 1, 5, 24 (1987).

20

similar fact patterns where law enforcement officials ignored "No Trespassing" signs and fences, entered private property, and observed illegal drug activity. The Court held that the specific language of the Fourth Amendment does not include open fields. *Oliver*, 466 U.S. at 177. The amendment's protection extends only to the curtilage area immediately surrounding one's home. *Oliver*, 466 U.S. at 178. Following *Oliver*, it appears that if an area is not curtilage, it is an open field unprotected by the Fourth Amendment. Despite the Court's intent to eliminate case-by-case determinations, the *Oliver* Court did not discuss how courts were to determine the distinction between curtilage and open fields.

Based on this omission, the Supreme Court suggested a four-part test for determining the extent of the curtilage area in *Dunn*, 480 U.S. at 301-03. In *Dunn*, officers who did not initially obtain a warrant, crossed a perimeter fence, entered a ranch, and observed a drug operation through an open barn door. The Court concluded that the barn and the area surrounding the barn were beyond the curtilage and were not protected by the Fourth Amendment. *Dunn*, 480 U.S. at 301.

The Court stated that curtilage questions should be resolved with particular reference to the following factors:

> [T]he proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

21

*Dunn*, 480 U.S. at 301 (citing *California v. Ciraolo*, 476 U.S. 207, 221, 106 S. Ct. 1809, 1817, 90 L. Ed. 2d 210, 222 (Powell, J., dissenting)). Each party in this case contends that the *Dunn* factors weigh in his or its favor. However, based on this State's Constitution, and its expressed regard for individual privacy, we decline to follow the U.S. Supreme Court's distinction between curtilage and open fields, and therefore, will not consider the applicability of the *Dunn* criteria to this case.

Although we have not previously followed *Dunn*, we have, in the past, applied the "open fields" doctrine in cases which are factually distinguishable from this case.

Before Montana's Constitution was amended in 1972, the doctrine was discussed in several cases. We initially followed *Hester* and held that the constitutional protections of Montana's analogous provision to the Fourth Amendment do not extend to an open field. *State v. Arnold* (1929), 84 Mont. 348, 275 P. 757; *State v. Ladue* (1925), 73 Mont. 535, 237 P. 495. Relying on *Arnold* and *Ladue*, we held that open pastures and farm lands are not protected by the Fourth Amendment, *State v. Perkins* (1969), 153 Mont. 361, 457 P.2d 465, or Montana's analogous constitutional provision, *State v. Johnson* (1967), 149 Mont. 173, 424 P.2d 728.

Following the amendment of Montana's Constitution in 1972, and after *Katz*, this Court began to analyze the open fields doctrine differently. In *State v. Charvat* (1978), 175 Mont. 267, 573 P.2d 660,

22

relying on *Hester*, this Court held that neither the Fourth Amendment, nor Article II, Section 11, of the Montana Constitution, extended protection to open fields. *Charvat*, 573 P.2d at 661. However, because *Katz* was decided after *Hester*, we stated that the determination of whether an intrusion was unreasonable depended upon whether one had an actual (subjective) expectation of privacy that society would recognize as reasonable. *Charvat*, 573 P.2d at 662. This Court, like the Court in *Katz*, cited authority for the proposition that the focus of search and seizure analysis is no longer on common law property concepts. *Charvat*, 573 P.2d at 662 (citing *Wattenburg v. United States* (9th Cir. 1968), 388 F.2d 853).

In *State v. Dess* (1982), 201 Mont. 456, 464, 655 P.2d 149, 153, we held that the "reasonableness of his expectation of privacy turned on the defendant's right to exclude others from the premises." Because the defendant admitted he had a diminished expectation of privacy in a public campground, and because of other facts, we held that the defendant did not have a reasonable expectation of privacy in the area searched. *Dess*, 655 P.2d at 154.

In 1983, we addressed an appeal from the denial of a motion to suppress evidence seized from an area of the defendant's fields. *State v. Bennett* (1983), 205 Mont. 117, 666 P.2d 747. In *Bennett*, a deputy sheriff following an anonymous tip observed marijuana plants growing in the defendant's garden through a 60 power scope from a nearby road. We concluded that the area surrounding the fenced

23

portion of the property was open field, and that the use of the spotting scope did not violate the defendant's reasonable expectation of privacy in an area that could be observed from a public road. *Bennett,* 666 P.2d at 749 (citing *Hester,* 265 U.S. 57). "Where no reasonable expectation of privacy exists, there is neither a 'search' nor a 'seizure' within the contemplation of the Fourth Amendment of the United States Constitution or Article II, Section 11 of the Montana Constitution." *Bennett,* 666 P.2d at 749. We concluded that the defendant voluntarily exposed the marijuana to the public by growing it in a garden near a county road, and therefore, that even if the defendant had a subjective expectation of privacy, it was not one society would recognize as reasonable. *Bennett,* 666 P.2d at 749.

Finally, in another case involving a marijuana grow operation, we held that the defendant did not have a legitimate expectation of privacy. In *State v. Sorensen* (1990), 243 Mont. 321, 792 P.2d 363, law enforcement officials, who were acting on a tip that the defendant was growing marijuana on forest service land and storing it on his property, began observing the defendant's property. The officers later obtained a warrant and seized evidence of the marijuana operation. The defendant contended that Article II, Section 10, of the Montana Constitution, protected him from trespass by law enforcement, and he contended they must have trespassed, or they could not have described his buildings in such detail in the search warrant.

24

We acknowledged that Montana's constitutional right of privacy is broader than the right of privacy under the Federal Constitution. *Sorensen*, 792 P.2d at 366 (citing *State v. Sierra* (1985), 214 Mont. 472, 692 P.2d 1273). However, we concluded that "[t]he "open fields" doctrine, providing that the right of privacy in one's home does not extend to open fields within the view of the public, has been recognized under Montana's right of privacy." *Sorensen*, 792 P.2d at 366 (citing *Charvat*, 573 P.2d at 661).[2] We held that the defendant did not have a legitimate expectation of privacy that would prevent law enforcement officers from observing buildings located on his unfenced land. *Sorensen*, 792 P.2d at 366. As these developments illustrate, we have followed the principles established in *Katz*, but have applied the "open fields" doctrine to our consideration of whether a person's expectation of privacy is one that society would consider reasonable. However, we have not had occasion to consider reasonableness under precisely the circumstances presented in this case.

Nor have we discussed the distinction between curtilage and open fields, or the impact of *Dunn* on Montana's constitutional guarantee of freedom from unreasonable searches. Therefore, we look to other jurisdictions which have addressed the open fields doctrine as applied to state constitutional provisions similar to ours under circumstances similar to those presented in this case.

---

[2] This citation to *Charvat* is inaccurate because *Charvat* discussed Article II, Section 11, not Section 10.

25

In 1988, the Oregon Supreme Court held that that state's nearly identical right to be free from unreasonable searches and seizures provided broader privacy protection in open fields than the United States Supreme Court had provided pursuant to the Fourth Amendment. *State v. Dixson/Digby* (Or. 1988), 766 P.2d 1015.

In *Dixson*, sheriff's deputies received information that marijuana was growing on heavily forested land owned by a lumber company. After an officer flew over the land and observed marijuana, officers were granted permission to drive on the land. As they approached the land, they came to an impassable dirt logging road which was on property being purchased by the Dixsons, who resided on the land. The officers walked on, passed several "no hunting" signs, pushed some brush aside, and observed marijuana plants located on the Dixsons' property. *Dixson*, 766 P.2d at 1016.

The next day, officers returned and discovered Lorin Dixson and Jeff Digby near the plants, arrested both of them, and seized the plants. The defendants moved to suppress the evidence based on the Fourth Amendment and the Oregon Constitution. The trial court denied the motion but was reversed by the Court of Appeals.

On appeal, that court was urged by the state to adopt the "open fields" exception to Oregon's constitutional warrant requirement based on the rationale in *Oliver*. However, that court, based on the same constitutional language considered by the U.S. Supreme Court in *Oliver*, declined to do so. It began its analysis by pointing out that the term "open fields" is not precise. In

26

fact, it was applied in *Oliver* to lands which were "neither fields nor, in any fair sense of the word, open; the open fields doctrine denies Fourth Amendment protection to all undeveloped and unoccupied land outside the curtilage of a residence." *Dixson*, 766 P.2d at 1020 (citing *Oliver*, 466 U.S. at 180 n.11). The court went on to explain that neither is the common law concept of curtilage applicable to constitutional analysis. It explained that:

> The rationale underlying the curtilage concept as it was used at common law--to provide a zone of protection to sleeping residents from the "midnight terror" of burglary--simply is not the same as the rationale underlying Article I, section 9, or, for that matter, the Fourth Amendment, each of which protects the privacy of the individual from warrantless invasion and scrutiny by the government and its minions. Reliance on the common-law concept of curtilage to justify excluding land outside the curtilage from the protections of either constitutional provision is misplaced.

*Dixson*, 766 P.2d at 1023.

The Oregon court pointed out that that state's right to be free from unreasonable searches and seizures was based not on a person's "reasonable expectation of privacy" but upon each "individual's interest in freedom from scrutiny, *i.e.*, his privacy." *Dixson*, 766 P.2d at 1023.

The court next concluded that land owners who have, at some expense, taken steps to exclude others from their property by use of signs, fences, or other measures, have expressed an intention to establish privacy which is protected under Oregon's constitutional right to be free from unreasonable searches and seizures. For that reason, the Oregon court established the following test to enable

27

police to determine whether an uninvited intrusion on private property constitutes a search under that state's constitution which requires a warrant:

> An individual's privacy interest in land he or she has left unimproved and unbounded is not sufficient to trigger the protections of Article I, section 9. Thus, it is not sufficient that the property in question is privately owned, or that it is shielded from view by vegetation or topographical barriers, because those features do not necessarily indicate the owner's intention that the property be kept private. A person who wishes to preserve a constitutionally protected privacy interest in land outside the curtilage must manifest an intention to exclude the public by erecting barriers to entry, such as fences, or by posting signs. This rule will not unduly hamper law enforcement officers in their attempts to curtail the manufacture of and trafficking in illegal drugs, because it does not require investigating officers to draw any deduction other than that required of the general public: if land is fenced, posted or otherwise closed off, one does not enter it without permission or, in the officers' situation, permission or a warrant.

*Dixson*, 766 P.2d at 1024.

Applying this rule, however, to the facts in that case, the Oregon Court held that the search was not illegal.

The Court of Appeals of New York has also refused to follow the United States Supreme Court's distinction between curtilage and an open field. *People v. Scott* (N.Y. 1992), 593 N.E.2d 1328.

In *Scott*, police had information that the defendant was growing marijuana on his property which consisted of 165 acres of rural, undeveloped woodlands. In spite of the fact that the property was conspicuously posted with no trespassing signs, and without the defendant's permission, police entered upon the property where they

28

personally observed plants. Based on those observations, and testimony of a private citizen, the police obtained a search warrant, pursuant to which they found and recovered marijuana plants beyond the curtilage of the residence which was located on the property. The defendant moved to suppress that evidence. However, based upon *Oliver*, New York's trial court and appellate division denied that motion. On appeal, New York's highest court was asked to decide whether it should follow *Oliver* and exclude open fields from the protection of its state constitutional right to be free from unreasonable searches and seizures. After thoughtful consideration, it declined to apply *Oliver* in the State of New York for the following reasons: (1) the conclusion that the Fourth Amendment does not apply to land was "contrary to the basic concept of post-*Katz* decisions that the amendment protects a person's privacy, not places"; (2) the constitutional history relied upon in *Oliver* was inapplicable to the comparable provision in New York's Constitution; (3) its effect was incompatible with Justice Brandeis's *Olmstead* dissent declaring the "right to be let alone--the most comprehensive of rights and the right most valued by civilized men"; (4) that state's private property laws indicated that the interest in privacy on land beyond the curtilage was one that New York society was prepared to recognize as reasonable; and (5) giving state agents unbridled license to roam freely on private land without permission was repugnant to basic notions of fairness

29

in that state's criminal law. *Scott*, 593 N.E.2d at 1334-37. For these reasons, the New York Court held that:

> [W]here landowners fence or post "No Trespassing" signs on their private property or, by some other means, indicate unmistakably that entry is not permitted, the expectation that their privacy rights will be respected and that they will be free from unwanted intrusions is reasonable.

*Scott*, 593 N.E.2d at 1338.

Therefore, that court held that the warrantless entry by police on the defendant's land violated that state's constitutional right to be free from unreasonable searches and seizures.

Like the *Dixson* court, the *Scott* court recognized that the Fourth Amendment was not literally interpreted in *Katz*. Neither a telephone booth, nor a conversation therein, can be described as a person, house, paper, or effect. *Scott*, 593 N.E.2d at 1334-35. Moreover, the Court had extended protection beyond the Fourth Amendment's literal language, e.g., business premises are protected but not included in the literal language. *Scott*, 593 N.E.2d at 1335 (citing *Marshall v. Barlow's, Inc.* (1977), 436 U.S. 307, 311, 98 S. Ct. 1816, 1819, 56 L. Ed. 2d 305, 310; *G.M. Leasing Corp. v. United States* (1976), 429 U.S. 338, 358-59, 97 S. Ct. 619, 631, 50 L. Ed. 2d 530, 547). In its final analysis, however, the court found those contradictions irrelevant because it was concerned with "a provision in a different Constitution with its own unique history." *Scott*, 593 N.E.2d at 1335.

30

That court refused, as this Court has in the past (*see State v. Sawyer* (1977), 174 Mont. 512, 571 P.2d 113), to march "[l]ockstep" with the United States Supreme Court's interpretation of similar provisions in the federal constitution. Instead, it agreed, as we do, with the observation by former Justice William Brennan that "state courts cannot rest when they have afforded their citizens the full protection of the federal Constitution" and without "the independent protective force of state law . . . the full realization of our liberties cannot be guaranteed." *Scott*, 593 N.E.2d at 1338 (citing Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 491).

Finally, and most recently, a Washington Court of Appeals found additional protection based on its state constitution. *State v. Johnson*, (1994 Wash. Ct. App. Div. 2), 879 P.2d 984.

In *Johnson*, federal and state officers, acting on information they received that Johnson was growing marijuana on his property, drove to his property and walked to the edge, but were unable to view any buildings. Johnson's property was bounded with a fence and a closed chain link gate and was posted with "Private Property" and "No Trespassing" signs on trees nearby. Aerial photographs were taken and DEA officers returned a couple days later at about 1:00 a.m., found the gate unlocked, and proceeded down a dirt road toward Johnson's property. They observed a barn, smelled marijuana growing, used a thermal imaging device, and discovered a grow

31

operation. The officers later received and executed a warrant based partly on these observations. *Johnson*, 879 P.2d at 987. Johnson's motion to suppress was denied, and on appeal he argued that the DEA activity violated the Washington Constitution.

The court first stated that the Washington Constitution provides more protection than the Fourth Amendment, partly because Washington has a strong tradition of protecting private property from unwanted intrusions and recognized criminal trespass for similar conduct. *Johnson*, 879 P.2d at 990.

The court acknowledged that the officers did not enter the curtilage, but that did not end its analysis under the Washington Constitution. Neither the open fields doctrine, nor the reasonable expectation test, was dispositive, but both were factors used to determine if the entry unconstitutionally intruded into a person's private affairs. That court concluded that its Constitution "does not foreclose a person's ability to protect his or her private affairs in an open field." *Johnson*, 879 P.2d at 993.

It held that fields that are fenced and posted with no trespassing signs are protected, and therefore, that the agents' entry was an unreasonable intrusion into Johnson's private affairs. *Johnson*, 879 P.2d at 993.

Like our sister states, Montana has a strong tradition of respect for the right to individual privacy.

> The Montana Constitution also provides that the people shall be free from unreasonable searches and seizures. Mont. Const. Art. II, § 11. Although the

language of this provision is nearly identical to that contained in the Fourth Amendment to the United States Constitution, we recognize that such a provision in the Montana Constitution may be interpreted so as to provide a greater amount of rights than that contained in the Federal Constitution. See, *State v. Johnson* (1986), [221] Mont. [503, 513], 719 P.2d 1248, 1254-55; and *Butte Community Union v. Lewis* (1986), [219] Mont. [426, 433], 712 P.2d 1309, 1313. Additionally, the Montana Constitution provides that the right of individual privacy shall not be infringed without the showing of a compelling state interest. Mont. Const. Art. II, § 10. There is no similar textual language in the United States Constitution and we have therefore recognized that this section grants rights beyond that inferred from the United States Constitution. See generally, *Montana Human Rights Division v. City of Billings* (1982), 199 Mont. 434, 649 P.2d 1283. Because Montana's Constitutional protections have an existence which is separate from the Federal Constitutional protections it is necessary to offer an independent analysis of the privacy and search and seizure provisions of the Montana Constitution.

*State v. Brown* (1988), 232 Mont. 1, 9-10, 755 P.2d 1364, 1370.

We conclude, based on this State's strong tradition of respect for individual privacy as reflected in our own unique Constitution, that the preceding discussions from our sister states are persuasive.

States are free to grant citizens greater protections based on state constitutional provisions than the United States Supreme Court divines from the United States Constitution. *State v. Sawyer* (1977), 174 Mont. 512, 515, 571 P.2d 1131, 1133 (overruled on other grounds by *State v. Long* (1985), 216 Mont. 65, 700 P.2d 153). We have chosen not to "march lock-step" with the United States Supreme Court, even when applying nearly identical language. *State v. Johnson* (1986), 221 Mont. 503, 512, 719 P.2d 1248, 1254. In addition, we

33

have held that Montana's unique constitutional language affords citizens a greater right to privacy, and therefore, broader protection than the Fourth Amendment in cases involving searches of, or seizures from, private property. *Sawyer*, 571 P.2d at 1133.

As the New York Court of Appeals stated in *Scott*, the rule that an individual may never have an expectation of privacy in open fields would be repugnant to our State's explicit recognition of privacy as a fundamental right which will not be violated absent a compelling state interest. Mont. Const. art. II, § 10. Likewise, as the Washington Court stated in *Johnson*, the fact that the officers did not enter the curtilage does not end our analysis based on Article II, Section 11. In this case, we decline to apply the United States Supreme Court's *Oliver* decision to Article II, Section 11, of the Montana Constitution.

We conclude that in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, "No Trespassing," or similar signs, or "by some other means [which] indicate[s] unmistakably that entry is not permitted" (*Scott*, 593 N.E.2d at 1338), entry by law enforcement officers requires permission or a warrant. As in our prior decisions, however, this requirement does not apply to observations of private land from public property. To the extent that our prior decisions in *Charvat*,

34

*Dess*, *Bennett*, and *Sorensen* are inconsistent with this holding, they are overruled.

We next discuss whether the State's entry onto Peterson's property without a warrant, and without permission, was prohibited under the circumstances in this case.

Peterson's cabin was initially built near a public road. However, due to vandalism, he moved his cabin away from the road to where it is barely visible from the road. After the move, Peterson's cabin was located in a forested area approximately 334 feet down a private road. A fence separated Peterson's property from the public road and a large metal gate controlled access to his property. Although the gate was open on this occasion, trees on either side of the gate were posted with "No Trespassing" signs. It was stipulated that people in the past, including members of the Jefferson County Sheriff's Department, requested permission to enter his land.

Peterson took numerous precautions to ensure that others would not enter his property without permission. We conclude that Peterson's expectation of privacy was reasonable. Therefore, under these circumstances, we hold that the entry onto Peterson's property and observation of the elk carcass, which could not have otherwise been observed, was an unreasonable search in violation of Article II, Section 11, of the Montana Constitution. Evidence that was gathered thereafter as a result of the unlawful search was inadmissible by virtue of the exclusionary rule. *See Wong Sun v. United*

35

*States* (1963), 371 U.S. 471, 486-88, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 455.

The State contends that Peterson allowed Anderson to inspect the elk and offered to take the officers to the kill site, and therefore, that the evidence was obtained from consensual activity which does not violate either the Fourth Amendment or its Montana counterpart. Even if Peterson consented, it was after the officers wrongfully entered his property and saw the elk. Consequently, it flowed from the unlawful intrusion and cannot be used to justify it.

We affirm the District Court's denial of the defendants' motion to dismiss. However, we hold that the District Court erred when it failed to grant the defendants' motion to suppress evidence obtained after the officers entered Peterson's property without permission or a warrant and observed the elk carcass. Because we base our decision on this issue, we do not find it necessary to address the other issues raised on appeal.

_____
Justice

We concur:

_____
Chief Justice

_____

36

Karla M. Gray

William E. Hunter

_____

W. William Leaphart

Justices