JUSTICE LEAPHART,
dissenting.
I respectfully dissent from the majority opinion. I would hold that sniff examinations performed by trained narcotics dogs constitute a search within the meaning of Article II, Sections 10 and 11 of the Montana Constitution. I would further hold that in order to conduct such a search within constitutional parameters, law enforcement must have a particularized suspicion that drug trafficking activity is taking place. Finally, I would hold that law enforcement in this case did not have a particularized suspicion to perform a sniff search on Sheetz’s luggage.
I
Article II, Section 11 of the Montana Constitution provides that “[t]he people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures.” We noted in State *52 v. Solis (1984), 214 Mont. 310, 693 P.2d 518, and affirmed in State v. Siegal (1997), 281 Mont. 250, 934 P.2d 176, that “ [t]he right to privacy is the cornerstone of protections against unreasonable searches and seizures. Thus a warrantless search can violate a person’s right of privacy and thereby violate the right to be free from unreasonable searches and seizures.” Solis, 693 P.2d at 522-23. Accordingly, a threshold question in determining whether a search occurred is whether there has been a governmental intrusion into an area where privacy is reasonably expected. In determining whether there is a reasonable expectation of privacy this Court looks to Article II, Section 10 of the Montana Constitution which provides:
The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.
We employ a two-part test in determining whether an individual has a constitutionally protected right to privacy: the individual must have a subjective expectation of privacy and that expectation must be one that society views as reasonable. Solis, 693 P.2d at 520. Therefore, we must determine first whether Sheetz had an expectation of privacy in the luggage and then whether his expectation was one that society views as objectively reasonable. Sheetz testified that when Officer Cwalinski asked to look in his suitcase, he refused to consent to the search. In addition, Sheetz asserts in his brief that “[w]e should... expect privacy in our luggage.” Thus, Sheetz contends that he had a subjective expectation of privacy in his luggage.
When an individual packs his personal belongings in a suitcase, he seeks not only to contain but also to conceal the contents of the luggage. The Court recognizes that “a person maintains a privacy interest in the contents of his checked luggage ...” but concludes that, “by checking luggage, he manifests less of an expectation of privacy than if he were to maintain its control and possession by not checking it.” By making a distinction between checked luggage which is entrusted to airline personnel and carry-on baggage over which an individual maintains control and possession, the Court effectively holds that when an individual checks his baggage he loses any meaningful expectation of privacy in the contents of his luggage.
I agree with the majority that an individual enjoys a heightened expectation of privacy in his person and in items in his personal possession. I disagree, however, with the conclusion that when a person “surrenders” his luggage at the check-in counter he has less of an expectation of privacy in the contents of that luggage. When *53 traveling by airplane, certain items may be carried on, but others, due to their size or dimensions must be checked because they cannot be properly stowed in the cabin of the plane. While the record does not reveal the exact dimensions of the luggage involved in this case, it is described in the transcripts as “a large black Delsey brand suitcase” indicating that the airline may have required that it be checked. In many instances, including perhaps this case, individuals do not have a choice of whether to check their baggage or to carry it on. The mere fact that a suitcase has been checked does not lead to the conclusion that its owner has voluntarily surrendered it and has thereby evinced less of an expectation of privacy in its contents. I would conclude that society is willing to recognize as objectively reasonable an individual’s expectation of privacy in the contents of his luggage whether it be checked in or carried on.
In addition to considering the reasonableness of an individual’s expectation of privacy, this Court considers the nature of the state’s intrusion when determining what constitutes a search. In the course of analyzing the constitutionality of thermal imaging in Siegal, we distinguished dog sniff procedures from thermal imaging searches by concluding that dog sniffs are more limited because they detect only illegal substances and do not reveal any information about the legal contents of the area being searched. Siegal, 934 P.2d at 186-87. While I agree that dog sniffs are more limited in this sense; they are, nonetheless, similar to thermal imaging in that they detect substances “which [individuals] do not knowingly expose to the public.” Siegal, 934 P.2d at 191. As we indicated in State v. Bullock (1995), 272 Mont. 361, 375, 901 P.2d 61, 70, “[w]hat a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.” Bullock, 901 P.2d at 70 (citing Katz v. United States (1967), 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576) (emphasis added).
The Court reasons that an individual does not have a privacy interest in characteristics of luggage that the public can readily observe in the airport such as its weight and color. With this I agree. However, the Court further concludes that an individual does not have a privacy interest in the air space surrounding his luggage and thus no interest in any odor detectable in that airspace. It is at this point that the Court takes a leap in analysis that I am not willing to take. In Siegal, we distinguished between “visible light [which] is perceived by the human eye, usually unaided, [and] infrared radiation [which], because of its longer wave length cannot be ‘seen’ *54 without the aid of a device, commonly known as a thermal imager.” Siegal, 934 P.2d at 180. In a similar fashion, I would distinguish between odors that can be detected by humans and those that are detectable only with the use of devices or dogs with a sense of smell far exceeding that of a human.
We recognized in Siegal that most courts which have addressed the use of thermal imaging in the investigation of marijuana growing operations, have held that the procedure does not constitute a search and does not violate the Fourth Amendment of the United States Constitution. Siegal, 934 P.2d at 181. However, we noted that in specifically providing Montanans with a constitutional right to privacy, the delegates of the 1972 Montana Constitutional Convention expressed particular concern with governmental intrusion through the use of various types of electronic monitoring and surveillance. Siegal, 934 P.2d at 191. Accordingly, we held in Siegal that the use of thermal imaging is a search subject to the warrant requirement of Article II, Section 11 of the Montana Constitution. Siegal, 934 P.2d at 190-91.
The Court holds that “when a person leaves the privacy of his home and exposes himself and his effects to the public and its independent powers of perception, it is clear that he cannot expect to preserve the same degree of privacy for himself or his affairs as he could expect at home.” While I agree with that proposition, I do not view a dog’s sense of smell as within the “public’s independent powers of perception.” I would distinguish, as we did in Siegal, between characteristics of the luggage which are detectable to human senses and those that are only detectable with the assistance of a canine’s more sophisticated olfactory sense. Although a trained narcotics detection dog is not an electronic detection device, “a dog does more than merely allow the police to do more efficiently what they could do using only their own senses. A dog adds a new and previously unobtainable dimension to human perception. The use of dogs, therefore, represents a greater intrusion into an individual’s privacy.” United States v. Place (1983), 462 U.S. 696, 719-20,103 S.Ct. 2637, 2651, 77 L.Ed.2d 110 (Brennan, J., concurring). In light of Sheetz’s subjective expectation of privacy and the fact that society is, I believe, willing to recognize a reasonable expectation of privacy in the contents of checked luggage, I would hold that the use of a trained narcotics dog to sniff the contents of checked airline luggage intrudes upon a protected privacy interest in a manner that constitutes a search within the meaning of Article II, Sections 10 and 11 of the Montana Constitution.
*55 II
While I would hold that a dog sniff investigation of luggage at an airport amounts to a search, I would further hold that it does not rise to the level of a type of search requiring probable cause and a search warrant. The Supreme Court, in United States v. Place, held that dog sniff procedures do “not constitute a ‘search’ within the meaning of the Fourth Amendment” but, nonetheless, amount to an investigatory detention requiring that officers have at least a reasonable suspicion before conducting a dog sniff. Place, 462 U.S. at 696, 103 S.Ct. at 2644 (“we conclude that when an officer’s observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of Terry and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion provided that the investigative detention is properly limited in scope”).
Since Place, several courts have followed the same analysis by analogizing dog sniffs to what has been termed a Terry investigatory stop which requires that officers have a reasonable suspicion before proceeding with an investigation. See, e.g., State v. Martinez (Idaho App. 1996), 925 P.2d 1125; People v. Boylan (Colo. 1993), 854 P.2d 807; State v. Torres (Conn. 1994), 645 A.2d 529; Commonwealth v. Johnston (Pa. 1987), 530 A.2d 74. This Court also recognizes the principles of Terry v. Ohio (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, or what have been termed Terry investigations as exceptions to the probable cause warrant requirement of Article II, Section 11. See, e.g., State v. Lott (1995), 272 Mont. 195, 900 P.2d 306 (automobile exception); State v. Graham (1995), 271 Mont. 510, 898 P.2d 1206 (search incident to arrest); State v. Stubbs (1995), 270 Mont. 364, 892 P.2d 547 (stop and frisk exception); State v. Dow (1992), 256 Mont. 126, 844 P.2d 780 (hot pursuit).
In recognizing these exceptions to the warrant requirement, we balance the compelling state interest in conducting an investigatory type search under exigent circumstances with the individual’s right of privacy and right to be free from unreasonable searches and seizures. We note that these exceptions to the warrant requirement, while not requiring probable cause, still implicate search and seizure protections. State v. Anderson (1993), 258 Mont. 510, 516, 853 P.2d 1245, 1249. Thus, investigatory searches conducted pursuant to a warrant exception require that law enforcement have a reasonable or “particularized suspicion” that criminal activity is taking place.
*56 Montana’s constitutional right of privacy requires that the state have a compelling state interest for intruding upon one’s right to privacy. When government intrudes upon a fundamental right, any compelling state interest for doing so must be closely tailored to effect only that compelling interest. State v. Pastos (1994), 269 Mont. 43, 47, 887 P.2d 199, 202. More specifically, while the state has a compelling interest in preventing drug courier activities in airports, that interest must be carefully tailored to effect only that compelling interest and must be balanced against an individual’s right to privacy in the contents of his baggage.
I agree with the Court that a dog sniff search is limited in both its invasiveness and what it can detect (only illegal substances). Furthermore, I recognize that the transient status of luggage in an airport environment distinguishes this case from the thermal image search of a stationary building in Siegal. Thus, in contrast to Siegal, I would not subject canine sniffs to the probable cause requirement of Article II, Section 11 of the Montana Constitution. On the other hand, I disagree with the Court’s allowing, carte blanche, canine sniffs of checked airport luggage in the absence of a particularized suspicion.
We expressed concern in Siegal that “there is presently nothing to stop law enforcement from simply selecting structures or a neighborhood at random and then scanning every home (or building) to determine whether any of the structures are generating a suspicious heat signature.” Siegal, 934 P.2d at 190. Likewise, under this Court’s opinion there is nothing to prevent law enforcement from housing a trained narcotics dog in the luggage area of any airport to randomly sniff every piece of luggage that passes by on the conveyor belt. Moreover, given the imperfect nature of a dog’s sense of smell[1] we should not allow law enforcement to randomly sniff search luggage *57 without at least a particularized suspicion to support the search. Therefore, rather than allow canine sniffing at the unbridled discretion of law enforcement, I would recognize airport dog sniff searches as an exception to the warrant requirement, and require that law enforcement have a particularized suspicion that an individual is involved in criminal activity before using trained narcotics dogs to sniff search the contents of airline luggage.
Ill
Finally, I would hold that law enforcement did not have a particularized suspicion justifying an investigatory sniff search of Sheetz’s luggage by a drug detecting dog. In State v. Reynolds we noted that “the issue of whether or not a particularized suspicion existed in order to justify an investigatory stop is factually driven.” Bauer v. State (1996), 275 Mont. 119, 125, 910 P.2d 886, 889 (citing State v. Reynolds (1995), 272 Mont. 46, 50, 899 P.2d 540, 543). When the totality of the circumstances does not create a particularized suspicion, the investigatory stop is not justified. Bauer, 910 P.2d at 889-90. Realizing that the term “particularized suspicion” resulted in ambiguities for law enforcement, we explained that the particularized suspicion must be comprised of objective data and circumstantial evidence from which “a trained officer draws inferences and makes deductions that lead the officer to a resulting suspicion that the individual is involved in criminal activity.” Anderson, 853 P.2d at 1248. In the case at hand, Officer Leighton did not have objective data and circumstantial evidence supporting a particularized suspicion justifying an investigatory sniff search of Sheetz’s luggage.
Officer Leighton of the Tucson Airport Authority testified that he was suspicious of Sheetz and his companions because they were “exhibiting signs of nervousness.” Officer Leighton explained that when he noticed the three individuals near the Continental Airlines ticket counter, each of them was carrying a duffle bag and one was pulling a new, hard-sided suitcase. He further explained that they were walking casually and talking among themselves. According to his account, when the three young men noticed Officer Leighton in his uniform, they stopped, continued talking among themselves and proceeded to stand by some couches near the ticket counter. Two of the individuals left Officer Leighton’s view for a few minutes, while the third remained with the luggage and “stared straight ahead towards the ticket counter....” Officer Leighton noted that he was not able to make eye contact with the individual who stayed with the *58 luggage. The two individuals returned a few minutes later, and they all checked in about fifteen minutes before their flight.
Based on this “suspicious” conduct, Officer Leighton decided to investigate their travel plans. He found that they had purchased their tickets from a travel agent and visited Tucson for only a couple of days. Officer Leighton checked the identification tag on the hard-sided suitcase; only a name and a phone number appeared on the tag. Officer Leighton explained that he had been trained to look for a “combination of characteristics” when investigating possible drug trafficking activity. Although Officer Leighton denied using a “profile,” he nonetheless explained that the appearance of the individuals and the circumstances of their travel led him to believe that Sheetz and his companions were involved in drug trafficking activity. As a result, Officer Leighton called the Billings Police Department, reported his suspicions, and recommended that the Billings Police perform a sniff search on the luggage when it arrived in Montana.
In contrast, Sheetz explained his conduct as follows: He and two friends walked into the airport near the Continental Airlines ticket counter. Each of his friends carried a duffle bag; Sheetz had a backpack, a camera bag and was pulling a hard-sided suitcase. They noticed that there were not many people in the airport, so they proceeded to the couch area and two of the individuals used the restroom. Shortly thereafter, they checked in at the ticket counter and checked their baggage. Sheetz does not recall seeing Officer Leighton at the Tucson Airport. Sheetz further testified that he arranged his travel plans with a travel agent approximately one week before his trip and spent three days in Tucson, conduct which he likened to any traveling business person.
I dare say that Officer Leighton’s inability to make eye contact with three young, long-haired men who talked among themselves and stood by a couch near the ticket counter until about 15 minutes before their flight would not lead a reasonable person to believe Sheetz and his companions conducted themselves in a manner consistent with drug trafficking activity. Even when Officer Leighton subsequently learned that they had purchased tickets from a travel agent and had only visited Tucson for a couple of days, the totality of the circumstances did not amount to a particularized suspicion warranting the sniff search that occurred in this case. Officer Leighton’s testimony that he believed the individuals were “exhibiting signs of nervousness” was based on “nothing more substantial than [an] inarticulate hunch[],” a standard which the United States Supreme Court, and *59 this Court have rejected as insufficient to warrant an investigatory intrusion. Reynolds, 899 P.2d at 542 (citing Terry, 392 U.S. at 22, 88 S.Ct. at 1880). Officer Leighton merely saw three young men with long hair, ponytails and facial hair. Such innocuous characteristics do not warrant the government’s allowing a trained “canine cannabis connoisseur” to savor the subtle aromas emanating from a traveler’s baggage. I dissent.

. See 1 William F. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.2(f) (3d ed. 1996) (citing Doe v. Renfrow (N.D.Ind. 1979) 475 F.Supp. 1012, aff'd in part (7th cir. 1980) 631 F.2d 91, where a dog “alerted” to a 13-year-old girl during a school-wide sniff of all students. The dog continued to alert to the girl even after she emptied all of her pockets, so she was subjected to a nude search. No drugs were found, but it was later discovered that she had been playing with her dog that morning and her dog was in heat. In addition, the dog alerted to some 50 students, only 17 of whom were found in possessionn of drugs. See also United States v. $639,558.00 in United States Currency (D.C.Cir. 1992) 955 F.2d 712, where a dog alerted to cocaine in traveler’s luggage, but no cocaine was found. It was determined that the dog was alerted to traces of cocaine on currency contained in the luggage. The court noted estimates that 75 to 97 percent of currency contains sufficient traces of cocaine to alert trained dogs.)