No. 97-545

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 161

295 Mont. 152

983 P.2d 322

STATE OF MONTANA,

Plaintiff and Respondent,

v.

MONTE RAY ROMAIN,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,

In and for the County of Lewis and Clark,

The Honorable Jeffrey Sherlock, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Nathan J. Hoines, Attorney at Law; Great Falls, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; C. Mark Fowler,

Assistant Attorney General; Helena, Montana

Mike McGrath, Lewis and Clark County Attorney; Mike Menahan,

Deputy; Helena, Montana

Argued: April 26, 1999

Submitted: May 11, 1999

No

Decided: July 8 , 1999

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

**¶1. Defendant, Monte Ray Romain, was charged in the Justice Court for Lewis and Clark County with possession of an illegally taken cow elk, with failure to properly validate an elk license, and with violating the State Fish, Wildlife, and Parks Commission rules and regulations by refusing to return to the kill site. The Justice Court granted Romain's motion to suppress evidence, and the State appealed the Justice Court decision to the District Court for the First Judicial District. On appeal, the District Court denied Romain's motion to suppress evidence. Following a nonjury trial, Romain was convicted of all charges against him. Romain now appeals the District Court order which denied his motion to suppress. We reverse the order and judgment of the District Court.**

**¶2. The following issue is dispositive on appeal:**

**¶3. Did the District Court err when it refused to suppress evidence obtained as a result of the warrantless search of Romain's property?**

FACTUAL AND PROCEDURAL BACKGROUND

**¶4. On November 12, 1996, between approximately 6:30 and 7:00 p.m., State Fish, Wildlife, and Parks (FWP) game warden, Wendy Kamm, received an anonymous tip that Monte Ray Romain and Bill Handel had illegally shot a cow elk near Lincoln, Montana. The anonymous tipster reported that the cow elk was in the back of a pickup truck concealed beneath a four-wheel all-terrain vehicle, and provided the**

license plate number of the truck. Officer Kamm contacted another game warden, Steve Vinnege, and asked him to assist her in the case. Kamm then watched for the vehicle at the intersection of Highways 223 and 287 while Vinnege ran computer checks on Romain and Handel at the FWP office in Great Falls. At approximately 8:00 p.m. Officer Vinnege, accompanied by FWP intern Bill Nevens, met Officer Kamm at the highway intersection where she was waiting to intercept the suspects. They then proceeded to Romain's farm. Officer Kamm led the way, because she had been to Romain's house approximately one or two weeks previously to ask Romain's permission to cross his property to get to adjacent property to investigate a report of a trespasser.

¶5. Romain's house is located approximately thirty-five miles north of Fort Benton and thirty-five miles south of Chester in an isolated stretch between Fort Benton and Chester. Access to Romain's property requires travel over eleven miles of graveled county road. Romain's land adjoins the county road for approximately seven or eight miles. It is fenced and marked with fluorescent orange paint in accordance with § 45-6-201, MCA, to notify others that it is private property to which the public is excluded. Romain's property is also bounded on one side by his cousin, Steve Romain's, property. The private road leading directly to Romain's house from the county road is about a quarter mile in length. There is a gate at the entrance to the road leading to Romain's house, and weathered "no trespassing" signs are posted at the gate but are no longer readable. Fluorescent orange paint is sprayed on at least one of the gate posts. Romain's house is obscured from the road by trees and bushes.

¶6. When the officers arrived at the turnoff to Romain's property, it was dark. Officer Kamm apparently looked for no trespassing signs and orange paint, but did not notice any postings. The gate leading to Romain's house was not closed, so the officers decided to proceed up to Romain's house.

¶7. Upon arriving at Romain's house and pulling into the driveway, the officers saw the truck with the four-wheeler and the elk in the back. The officers could see the elk, but they could not determine what sex the elk was. The license plates on the truck matched the license number given by the anonymous tipster. The officers then knocked on Romain's door, and his wife answered. She went to get Romain, and he came to the door. Romain stepped outside to speak with the officers, and the officers asked if they could look at the tag on the elk in the back of the truck. They explained that they were following up on an anonymous tip, and wanted to look at the elk and

the tag. The wardens walked over to the truck with Romain, and one of the wardens confiscated the tag.

¶8. The officers asked Romain more questions, and Romain asked whether he was under arrest. The officers told him he was not. They then asked Romain where he had shot the elk, and asked him to describe the hunt. Romain told the officers that he had shot the elk in district 422, one of the few areas where a permit to take a cow elk is not needed. Romain also told the officers that he had shot the elk on Forest Service land. He further told them that he could not remember the exact spot where he shot the elk or the exact date on which he had shot it. The officers then asked Romain to return to the kill site with them. Apparently Romain did not respond to the request or to any further questioning.

¶9. At one point during the questioning, Romain asked if he could go into his house to use the bathroom. He was allowed to go in alone. After questioning Romain, and while still at Romain's residence, the wardens contacted Bill Handel via their FWP cellular phone. His story apparently differed from Romain's. Officer Vinnege then asked Romain to get into the passenger side of his truck and read Romain Miranda warnings.[1] The officers questioned Romain further. Before leaving, Officer Kamm reiterated that Romain needed to contact her so that they could go to the kill site.

¶10. The following day, the officers obtained a search warrant to search Romain's property for the elk. Thereafter, Officer Kamm issued Romain three citations charging him with failure to properly validate an elk license, possession of an illegally taken elk, and with refusal to return to the kill site. Romain was commanded to appear before Justice Wallace Jewell, Justice of the Peace for Lewis and Clark County Justice Court.

¶11. On February 1, 1996, Romain filed a motion to suppress statements and a motion to suppress evidence. The Justice Court granted his motion to suppress evidence. In support of its order, Justice Jewell relied on *State v. Bullock* (1995), 272 Mont. 361, 901 P.2d 61, and found that Romain had a reasonable expectation of privacy and that, therefore, the warrantless search was improper and any evidence gathered as a result of that search was inadmissible by virtue of the exclusionary rule. The State appealed the Justice Court order to the First Judicial District Court for Lewis and Clark County. The State further requested that the case be wholly transferred to the District Court pursuant to § 46-20-103(2)(e), MCA.

¶12. Romain filed motions with the District Court identical to those he filed in the Justice Court. A hearing on the motions to suppress was held on May 16, 1996. The District Court denied all of Romain's motions. In its June 7, 1996 order which denied the motion to suppress, the District Court, like the Justice Court, found that this Court's decision in *State v. Bullock* was controlling, but held that the facts of the present case were distinguishable from those presented in *Bullock*. The District Court concluded that Romain did not have a reasonable expectation of privacy on his property.

¶13. A bench trial was held on December 16, 1996. On March 18, 1997, the District Court found Romain guilty of all three charges. On June 26, 1997, Romain filed a notice of appeal to this Court.

## STANDARD OF REVIEW

¶14. We review a district court's conclusions of law to determine whether the court interpreted the law correctly. *See Anderson v. Werner Enter., Inc.,* 1998 MT 333,

¶ 6, 972 P.2d 806, ¶ 6 (citing *Carbon County v. Union Reserve Coal Co.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686). We review a district court's findings of fact following suppression hearings to determine whether they are clearly erroneous. *See State v. Grey* (1995), 274 Mont. 206, 209, 907 P.2d 951, 953 (citing *State v. Kaluza* (1993), 262 Mont. 360, 361, 865 P.2d 263, 264).

## DISCUSSION

¶15. Did the District Court err when it refused to suppress evidence and statements obtained as a result of the warrantless search of Romain's property?

¶16. The District Court found that Romain's house was secluded, and that it could barely be seen from the road because of a shelter belt of trees and shrubs. The court also noted that Romain's nearest neighbor was four miles away, and that Romain testified that he did not expect people to come onto his property. Evidence was presented at the suppression hearing which showed that Romain's property was fenced, and that it was posted with fluorescent orange paint in accordance with § 45-6-201(2), MCA, to notify the public that no trespassing was allowed. Testimony further showed that Romain's driveway is one quarter mile long, and that he had a

barbed wire gate at the entrance that was not closed on the night the FWP wardens went to Romain's to investigate the anonymous tip.

¶17. In its order, the District Court stated that the most important evidence was that Officer Kamm had been to Romain's house approximately one to two weeks prior to the incident in question to ask his permission to cross his property, and at that time Romain did not indicate that Officer Kamm needed Romain's permission to come to his house. The court held that the "justice court was in error in its order of March 7, 1996, suppressing the seized elk and the observations of the officers." The District Court concluded that this Court's decision in *State v. Bullock* (1995), 272 Mont. 361, 901 P.2d 61, was controlling but was "exactly opposite" the facts in the present case. In *Bullock,* the defendant was charged with possession of an illegally killed game animal and with unlawfully killing a game animal. *See Bullock,* 272 Mont. at 364, 901 P.2d at 63. In that case, we held that Article II, Section 11 of the Montana Constitution prohibits warrantless searches and seizures on private land that falls outside the curtilage area of a dwelling under some circumstances, including those presented in that case. *Bullock,* 272 Mont. at 69-76, 901 P.2d at 61, 67. We held that the defendant in *Bullock* had a reasonable expectation of privacy, and that the warrantless search on his property was a violation of Article II, Section 11 of the Montana Constitution. We concluded that the Montana Constitution confers a greater right of privacy than the right of privacy granted by the U.S. Constitution. *See Bullock*, 272 Mont. at 378, 901 P.2d at 72. We stated that:

[I]n Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, "No Trespassing," or other similar signs, or "by some other means [which] indicate[s] unmistakably that entry is not permitted" (*Scott,* 593 N.E.2d at 1338), entry by law enforcement officers requires permission or a warrant.

*See Bullock, 272 Mont. at 384, 901 P.2d at 76. In Bullock, the defendant's property was located about seven miles up a one-lane Forest Service road, was fenced and gated, and marked with "no trespassing" signs. The gate was open when the officers unlawfully entered the property. See Bullock, 272 Mont. at 365, 901 P.2d at 64. The defendant had also moved his cabin behind a hill to obscure it from passersby. See Bullock, 272 Mont. at 365, 901 P.2d at 64. Law enforcement officers had always gotten the defendant's permission to access his property. See Bullock, 272 Mont. at 366, 901 P.2d at 64.*

¶18. We conclude that the present case is indistinguishable from *Bullock* in any material respect. Romain's house is secluded and barely visible from the county road because it is obscured by trees and shrubs. Romain did not move his house as the defendant in *Bullock* did. It was not necessary. His property is fenced, properly marked in accordance with § 45-6-201(2), MCA, and there is a gate at the entrance with at least one gatepost spray painted fluorescent orange. There are weathered "no trespassing" signs at the gateway to Romain's property, although they are no longer readable. We conclude that under the circumstances of this case, Romain's expectation of privacy was reasonable. Therefore, the officers' entry onto Romain's property was unlawful.

¶19. The State argues that because Officer Kamm had been to Romain's house previously, that his expectation of privacy was not reasonable. However, Officer Kamm had come to Romain the week prior to the incident in question to ask Romain's permission to cross his property. The state further contends that § 45-6-201 (1), MCA, required Romain to "revoke the officers' privilege to remain on the land." Where there was no permission granted in the first instance, there is no such requirement. Section 45-6-201(1) provides that:

Privilege to enter or remain upon land is extended either by the explicit permission of the landowner or other authorized person or by the failure of the landowner or other authorized person to post notice denying entry onto private land. The privilege may be revoked at any time by personal communication of notice by the landowner or other authorized person to the entering person.

Romain neither explicitly extended permission to Officer Kamm, nor did he fail to post notice that entry onto his land was prohibited. Therefore, the game wardens were not privileged to enter Romain's property, but entered his property unlawfully.

¶20. In *Bullock* we further held that the exclusionary rule pronounced in *Wong Sun* v. *United States* (1963), 371 U.S. 471, 486-88, 83 S. Ct. 407, 417, 9 L. Ed. 2d 441, 445, prohibited the use of the evidence seized as a result of the unlawful search. *See Bullock*, 272 Mont. at 384, 902 P.2d at 76. The state in *Bullock* contended that the Defendant allowed the state to inspect the elk, and that the evidence was, therefore, obtained by consent and did not violate the Fourth Amendment or Article II, Section 11 of the Montana Constitution. *See Bullock*, 272 Mont. at 384, 902 P.2d at 76. We,

however, concluded that even if the defendant had consented, it was after the officers wrongfully entered his property, and that the evidence "flowed from the unlawful intrusion and cannot be used to justify it." *See Bullock*, 272 Mont. at 384, 902 P.2d at 76. In *Bullock,* we concluded that the District Court erred when it denied the defendant's motion to suppress evidence. *See Bullock*, 272 Mont. at 384, 902 P.2d at 76.

¶21. In the present case, the state likewise asserts that the information obtained from observing Romain's elk tag was obtained with Romain's consent. The officers asked Romain if they could see the elk tag, he apparently consented, and then the officers looked at and seized the tag. However, as in *Bullock,* the consent was given only after the officers wrongfully entered Romain's property, and therefore cannot be used against Romain.

¶22. We conclude that the District Court erred when it denied Romain's motions to suppress evidence and statements. We reverse the order of the District Court and the judgment which followed, and remand for further proceedings consistent with this opinion.

¶23. Although Romain has raised other issues regarding the constitutionality of §§ 87-1-102 and -301, MCA, pursuant to which he was prosecuted and convicted for refusing to return to the kill site, we decline to address those issues at this time. After excluding all evidence which was derived from the unlawful entry onto Romains' property, it is unclear to us whether there is a factual basis for further prosecution of Romain. That issue is best left to the District Court on remand. If no further prosecution is possible, then it is unnecessary to address the constitutionality of the challenged statutes. If further prosecution is possible, we conclude that additional factual development and briefing would be helpful to our consideration of these issues.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ JAMES C. NELSON

/S/ KARLA M. GRAY

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

1. **1** Pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694.