

DA 07-0468

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 409

STATE OF MONTANA,

Plaintiff and Appellee,

v.

SAM COTTERELL,

Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and For the County of Broadwater, Cause No. DC 2005-027
Honorable Jeffrey M. Sherlock and Honorable Dorothy M. McCarter,
Presiding Judges

COUNSEL OF RECORD:

For Appellant:

KD Feeback, Jon G. Moog, Gough, Shanahan, Johnson & Waterman,
Helena, Montana

For Appellee:

Hon. Mike McGrath, Montana Attorney General, Barbara C. Harris,
Assistant Attorney General, Helena, Montana

Submitted on Briefs: May 21, 2008

Decided: December 9, 2008

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Sam Cotterell was convicted by a jury of seven misdemeanor hunting violations. He now appeals the Judgment and Sentence entered against him in the District Court for the First Judicial District, Broadwater County. We affirm.

¶2     Cotterell raised seven issues on appeal which we have consolidated and rephrased as follows:

¶3     1. Whether the District Court erred in denying Cottrell's Motion to Suppress.

¶4     2. Whether the District Court erred in denying Cottrell's Motion to Dismiss.

¶5     3. Whether the District Court erred in its interpretation of the provisions of § 87-1-102(2)(b), MCA (2003), at sentencing.

### Factual and Procedural Background

¶6     On October 1, 2004, Doug Monger, the State Parks Division Administrator for the Montana Department of Fish, Wildlife and Parks (DFWP), and Tom Reilly, the assistant administrator, were returning to Helena from a DFWP meeting in Bozeman in Monger's airplane. They were flying between 200 and 2,500 feet, at a speed of approximately 80 to 100 miles an hour, which was Monger's typical flight practice.

¶7     During their flight, Monger and Reilly observed a game feeder and salt-block container in the vicinity of a hunting stand on property adjacent to the Missouri River near Townsend, Montana. Monger circled the area once or twice to take another look at the hunting stand. Upon their return to their office in Helena, Monger and Reilly each independently reported what they had seen to the enforcement division of DFWP.

¶8 On October 7, 2004, DFWP Game Warden Chris Anderson received the report and began an investigation of the property in question. He went to the area described by Monger and Reilly to corroborate the information. Once there, he discovered that the property lies in bottom lands adjacent to the Missouri River. It is situated at the end of a dead-end road, is surrounded by thick brush, and is fenced around its entire perimeter. The property has a gate at the entrance and is posted with no trespassing signs.

¶9 Anderson observed the area from an adjoining property, from the Missouri River, and from a county road. The adjoining property belonged to Ward Scoffield. Although Scoffield had not granted Anderson explicit authority to enter his property on this occasion to surveil the neighboring property, Scoffield had granted Anderson permission to enter his property in the past.

¶10 Anderson's investigation of the property revealed an elevated hunting stand within 100 yards of a salt tray. Although Anderson was unable to see inside the tray, he speculated that it was placed for baiting of game animals. Anderson subsequently discovered that Cotterell owned the property in question and that he leases a portion of his property to the Hahn Ranch for cattle grazing.

¶11 Anderson returned to surveil Cotterell's property on October 24, 2004, the opening day of the general hunting season. Because it is a violation of state law to use two-way communication devices to hunt big game animals, Anderson monitored the traffic on a public, family-service radio channel. When Anderson overheard conversations that related to the property he was investigating, he recorded them. Anderson noted that the actions of the people he was watching matched the conversations

3

of the people to whom he was listening. These conversations included discussions of the location of deer as well as hunting plans, strategies and actions. Two hand-held radios later seized during the search of Cotterell's property were set to this same frequency.

¶12 The following day, Anderson returned to a location near Cotterell's property. At one point during the day, he watched as Cotterell walked across the river to a dead whitetail buck lying in the water near the far shoreline. This property is owned by Scoffield, not Cotterell. Cotterell then left the deer, returned to his property and came back on an eight-wheeled off-highway vehicle. Anderson photographed Cotterell as Cotterell drove the vehicle through the river and onto Scoffield's property where Cotterell retrieved the deer and returned to his own property without tagging the deer.

¶13 On October 27, 2004, Anderson applied to the Broadwater County Justice of the Peace for a warrant to search Cotterell's property. Anderson, along with two other DFWP officers, executed the search warrant on November 6, 2004. Cotterell was not home when the officers arrived, but John Gray, a friend of Cotterell's who was living there at the time, admitted them. In their search, the officers found deer parts (including parts of two mule deer), photographs, and documents relating to the hunting of game animals.

¶14 Before the wardens left the property, Cotterell arrived and was interviewed by Anderson. During that interview, Cotterell told Anderson that he had shot a whitetail doe and a whitetail buck that year. He described taking a doe under the circumstances that Anderson had seen him retrieve the buck two weeks before. After Anderson informed Cotterell that he had watched that incident, Cotterell admitted that he shot the buck and

later tagged it with a doe tag. Cotterell also admitted that, rather than shooting a doe and a buck, he shot two whitetail bucks and that the buck currently hanging in his garage was killed in violation of the overlimit law. He also said that the remaining parts of the buck he shot while Anderson was watching were at his residence in Bozeman.

¶15 Anderson asked Cotterell about the parts of the two mule deer the officers found during their search. Cotterell stated that they had been shot by his son and grandson on Cotterell's property. However, Cotterell's property is entirely within hunting district 391, and the hunting permits held by Cotterell's son and grandson were for hunting district 380 which is across the Missouri River from Cotterell's property. Thus, the permits were not valid for hunting mule deer on Cotterell's property.

¶16 Anderson also applied for and executed a search warrant on Cotterell's residence in Bozeman on November 9, 2004. There Anderson found the head of the whitetail buck that he watched Cotterell retrieve with the off-highway vehicle from Scoffield's property. The buck was tagged with a doe tag.

¶17 After reviewing all of the evidence (including calendars, journals, statements of witnesses, photographs, marked frozen meat and license information), Anderson learned that in 2003, Cotterell shot three bucks and a doe on his property without the proper licenses or permits and in violation of the law regarding taking an overlimit of animals. And, in 2002, Cotterell shot a mule buck, a whitetail doe and a whitetail buck in violation of the overlimit law. In addition, the mule buck was shot without a license.

¶18 As a result of Anderson's investigation, Cotterell was charged by Information with eight counts of hunting violations, including three misdemeanor counts of killing more

5

than the legal limit of game animals in violation of § 87-3-103, MCA (2003); one misdemeanor count of hunting without a license in violation of § 87-2-103, MCA (2003); one misdemeanor count of possession of an unlawfully killed game animal in violation of § 87-3-112, MCA (2003); one misdemeanor count of using two-way communication devices while hunting in violation of § 87-1-125, MCA (2003); one misdemeanor count of hunting without landowner permission in violation of § 87-3-304, MCA (2003); and one felony count of possessing unlawfully taken wildlife in violation of § 87-3-118, MCA (2003).

¶19    Cotterell raised a variety of issues related to the suppression of evidence in three briefs filed October 11, 2005, March 15, 2006, and May 2, 2006. These issues were addressed and denied by the District Court in an order dated June 28, 2006.

¶20    Cotterell was tried before a jury on the above charges on January 29 and 30, 2007. He was acquitted on the charge of hunting without landowner permission and convicted of the remaining seven charges with the felony count reduced to a misdemeanor based on the value of the animals unlawfully taken.

¶21    The District Court sentenced Cotterell to serve six months in the county jail on each count, with all time suspended. The sentences were to run concurrently. The District Court also imposed various fines and ordered Cotterell to pay restitution for the value of the animals unlawfully killed or taken. In addition, the court suspended Cotterell's hunting, fishing and trapping privileges for a period of two years from the date of conviction. The court stayed the execution of its judgment pending appeal.

**Issue 1.**

6

¶22    *Whether the District Court erred in denying Cottrell's Motion to Suppress.*

¶23    We review the denial of a motion to suppress to determine whether the findings of fact supporting a district court's decision are clearly erroneous, and whether the court's interpretation and application of the law are correct.  *State v. Munson*, 2007 MT 222, ¶ 18, 339 Mont. 68, ¶ 18, 169 P.3d 364, ¶ 18 (citing *State v. Copelton*, 2006 MT 182, ¶ 8, 333 Mont. 91, ¶ 8, 140 P.3d 1074, ¶ 8; *State v. Bassett*, 1999 MT 109, ¶ 17, 294 Mont. 327, ¶ 17, 982 P.2d 410, ¶ 17; *State v. Loh*, 275 Mont. 460, 475, 914 P.2d 592, 601 (1996)).  A court's findings of fact are clearly erroneous if they are not supported by substantial credible evidence, if that court has misapprehended the effect of the evidence, or if our review of the record leaves this Court with a definite or firm conviction that the district court has made a mistake.  *Munson*, ¶ 18 (citing *State v. DeWitt*, 2004 MT 317, ¶ 21, 324 Mont. 39, ¶ 21, 101 P.3d 277, ¶ 21; *Loh*, 275 Mont. at 475, 914 P.2d at 601).

¶24    In this case, Cotterell argued in the trial court that the State's investigation was fatally flawed from its inception due to the warrantless aerial "search" of Cotterell's property.  Cotterell also argued that this initial error was compounded by numerous other errors by the investigating game warden including monitoring the private conversations Cotterell had with his son over their hand-held radios and executing an overly-broad search warrant without sufficient probable cause to justify the search.

¶25    The Fourth Amendment to the United States Constitution safeguards the right of the people to be secure "in their persons, houses, papers, and effects" from unreasonable searches and seizures.  Montana's constitutional provision regarding searches and seizures mirrors the Fourth Amendment:

7

> **Searches and seizures.** The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures. No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing.

Mont. Const. art. II, § 11. Unlike its federal counterpart, however, the Montana Constitution explicitly guarantees to its citizens the right of individual privacy.

> **Right of privacy.** The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest.

Mont. Const. art. II, § 10. Thus, Montana's Constitution affords citizens broader protection at the hands of the government in search and seizure cases than does the Federal Constitution. *State v. Siegal*, 281 Mont. 250, 263, 934 P.2d 176, 183 (1997), *overruled in part and on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, ¶ 19, 970 P.2d 556, ¶ 19. Consequently, search analysis in Montana is typically conducted under both Article II, Section 10, and Article II, Section 11. *Munson*, ¶ 49 (citing *Siegal*, 281 Mont. at 264-65, 934 P.2d at 184; *State v. Scheetz*, 286 Mont. 41, 45, 950 P.2d 722, 724 (1997); *State v. Tackitt*, 2003 MT 81, ¶ 17, 315 Mont. 59, ¶ 17, 67 P.3d 295, ¶ 17).

¶26 This Court has applied the two-prong test from *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507 (1967), in determining whether a search within the meaning of the Fourth Amendment was actually conducted and, if so, whether the search was reasonable. *Siegal*, 281 Mont. at 262, 934 P.2d at 183. In *Katz*, the United States Supreme Court stated:

> What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Katz*, 389 U.S. at 351, 88 S. Ct. at 511 (internal citations omitted). In concurring with the majority opinion, Justice Harlan summarized the rule that has emerged from *Katz* and from prior decisions as requiring, "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Katz*, 389 U.S. at 361, 88 S. Ct. at 516 (Harlan, J., concurring).

¶27 Along those same lines, we have determined that, in Montana, a search occurs

> "when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable." Where no objectively reasonable expectation of privacy exists, a "search" does not occur within the contemplation of Article II, Section 11 of the Montana Constitution.

*State v. Goetz*, 2008 MT 296, ¶ 25, 345 Mont. 421, ¶ 25, 191 P.3d 489, ¶ 25 (citing *State v. Hamilton*, 2003 MT 71, ¶ 17, 314 Mont. 507, ¶ 17, 67 P.3d 871, ¶ 17; *Scheetz*, 286 Mont. at 46, 950 P.2d at 725).

¶28 We apply the foregoing analysis to each of Cotterell's specifications of error set forth in his Motion to Suppress.

*A. Warrantless aerial "search"*

¶29 Cotterell contends on appeal that all of the State's evidence should have been suppressed "because of the warrantless aerial surveillance conducted by State agents." Cotterell relies on our decision in *Siegal*, 281 Mont. at 274, 934 P.2d at 190, for the

9

proposition that agents of the State may not search or seize the private effects of Montana's citizens absent authority to do so by virtue of a search warrant issued by a neutral and detached magistrate.

¶30  In *Siegal*, law enforcement officers used a thermal imaging device to measure heat emissions from the buildings on the defendant's property to determine whether the distribution of heat energy was consistent with the presence of grow lamps used to cultivate marijuana. Based in part on the results of the thermal imaging scan, the officers obtained a warrant to search the defendant's property where the officers found a large marijuana growing operation. *Siegal*, 281 Mont. at 254-55, 934 P.2d at 178-79. We held in *Siegal* that the use of thermal imaging to obtain evidence of criminal activity is a search subject to the warrant requirement of Article II, Section 11 of the Montana Constitution because people have "an actual (subjective) expectation of privacy in the heat signatures of activities, intimate or otherwise, which they pursue within the confines of their private homes and enclosed structures and which they do not knowingly expose to the public." *Siegal*, 281 Mont. at 275, 934 P.2d at 191.

¶31  In the case *sub judice*, unlike the facts in *Siegal*, Monger and Reilly were not using a thermal imaging device or any other type of equipment to either see inside the buildings on Cotterell's property or even to observe what was in plain view on Cotterell's property. Their observations of Cotterell's property were done simply with the naked eye. In fact, they did not take any photos of what they had seen even though they had a camera with them.

¶32   Cotterell points out that his property is fenced and posted with "No Trespassing" signs, the entrance is gated, and the buildings cannot be seen from the road. Thus, he maintains that he had a reasonable expectation of privacy in his property, home, and buildings, and that this expectation of privacy would be recognized by society as reasonable given this Court's holdings in *State v. Bullock*, 272 Mont. 361, 901 P.2d 61 (1995), and *State v. Romain*, 1999 MT 161, 295 Mont. 152, 983 P.2d 322.

¶33   In *Bullock*, even though the defendant's property was posted with "No Trespassing" signs on each side of the gate leading to his property, a game warden and another individual entered the property through the gate and drove down the private road leading to the defendant's cabin pursuant to a tip that defendant had illegally shot a bull elk. They did not have permission to enter the property, nor did they secure a search warrant prior to entering. As they approached the cabin, they observed a large bull elk hanging from a tree in an area a short distance from the cabin. The elk could not be seen from the public road, nor was there evidence that it could be seen from any other public location. *Bullock*, 272 Mont. at 365-66, 901 P.2d at 64.

¶34   We stated in *Bullock* that "[w]hat a person knowingly exposes to the public is not protected, but what an individual seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Bullock*, 272 Mont. at 375, 901 P.2d at 70 (citing *Katz*, 389 U.S. at 351, 88 S. Ct. at 511). Thus, we held in *Bullock* that,

> in Montana a person may have an expectation of privacy in an area of land that is beyond the curtilage which the society of this State is willing to recognize as reasonable, and that where that expectation is evidenced by fencing, "No Trespassing," or similar signs, or "by some other means [which] indicate[s] unmistakably that entry is not permitted," entry by law

11

> enforcement officers requires permission or a warrant. As in our prior decisions, however, *this requirement does not apply to observations of private land from public property*.

*Bullock*, 272 Mont. at 384, 901 P.2d at 75-76 (emphasis added and internal citation omitted).

¶35 Similarly, in *Romain*, based on an anonymous tip that the defendant had illegally shot a cow elk, two game wardens entered defendant's property and drove to his house to speak with him. Defendant's property was fenced and marked with orange paint to notify others that it is private property to which the public is excluded. Weathered "No Trespassing" signs were posted at the gate leading to defendant's house, but the signs were no longer readable. However, fluorescent orange paint was sprayed on at least one of the gate posts. In addition, the house was obscured from the road by trees and bushes. Upon arriving at the house, the wardens saw a truck with an elk in the back. *Romain*, ¶¶ 4-7. We held in *Romain*, that the defendant's expectation of privacy in his property was reasonable, because it was fenced and properly marked with orange paint. Thus, we held that the wardens' entry onto the defendant's property without express permission and without a warrant was unlawful. *Romain*, ¶¶ 18-19.

¶36 In the instant case, unlike *Bullock* and *Romain*, Monger and Reilly did not physically intrude onto Cotterell's property. Instead, their observations were made when they flew over the property in Monger's airplane while returning from a DFWP meeting in Helena. Nevertheless, Cotterell argues that as in *Bullock* and *Romain*, all of the evidence seized from his property should be suppressed because it was the fruit of a warrantless aerial search by State agents.

12

¶37 The question of whether law enforcement officers can actually conduct warrantless aerial surveillance of an individual's property is not before us in this case. Instead, the aerial observations in this case that led to Anderson's investigation of Cotterell's hunting activities, were made accidentally and were not part of any surveillance of the property by law enforcement officers.

¶38 Monger testified at the hearing on Cotterell's Motion to Suppress that it was common for him to fly along the river in that area because "[i]t's part of the direct route and also real scenic compared to the Sagebrush Hills on the south side of the river, a lot more wildlife to see there, more interesting." In addition, Monger and Reilly testified that they were not observing or looking for anything in particular during this trip, nor did they have any law enforcement duties that were being fulfilled on the flight.

¶39 In *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809, 1812 (1986), the United States Supreme Court stated:

> The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.

We agree with the State in this case that Cotterell's posting of his property cannot be deemed as sufficient to shield any and all observation of items not shielded or protected from view from places exterior to the property.

¶40 Accordingly, we hold that Monger's and Reilly's innocent observation of Cotterell's property was not a search as contemplated by the Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution.

*B. "unlawful trespass"*

¶41 In his original Motion to Suppress, Cotterell argued that Anderson trespassed on Cotterell's property while conducting his investigation prior to obtaining a search warrant. However, the evidence and testimony introduced at the hearing on Cotterell's suppression motion and at trial indicated that was not the case. Cotterell has now changed his theory on appeal to argue that the evidence obtained during the search should be suppressed because Anderson unlawfully trespassed on neighboring lands during his investigation without the express authority of the landowner.

¶42 The State argues that we should decline to address this issue on appeal because Cotterell did not raise it in the District Court. We have repeatedly stated that, absent plain error, we will not consider an issue not timely raised in the district court, *State v. Torgerson*, 2008 MT 303, ¶ 20, 345 Mont. 532, ¶ 20, 192 P.3d 695, ¶ 20 (citing *State v. Minez*, 2004 MT 115, ¶ 30, 321 Mont. 148, ¶ 30, 89 P.3d 966, ¶ 30), nor will we consider a party's change in legal theory, *State v. Harlson*, 2006 MT 312, ¶ 19, 335 Mont. 25, ¶ 19, 150 P.3d 349, ¶ 19 (citing *State v. Wetzel*, 2005 MT 154, ¶ 13, 327 Mont. 413, ¶ 13, 114 P.3d 269, ¶ 13).

¶43 In response to the State's claim that Cotterell waived this argument by not raising it in the trial court, Cotterell argues in his reply brief on appeal that we should address this issue and review the record for plain error under our authority established by *State v.*

*Finley*, 276 Mont. 126, 915 P.2d 208 (1996). However, Cotterell has not established plain error.

¶44 Under the plain error doctrine, this Court

> "may discretionarily review a claimed error that implicates a criminal defendant's fundamental constitutional rights—even if a timely objection was not made in the trial court, and notwithstanding the inapplicability of the criteria set forth in § 46-20-701(2), MCA—where failing to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process."

*State v. Mackrill*, 2008 MT 297, ¶ 48, 345 Mont. 469, ¶ 48, 191 P.3d 451, ¶ 48 (quoting *State v. Rosling*, 2008 MT 62, ¶ 77, 342 Mont. 1, ¶ 77, 180 P.3d 1102, ¶ 77). As we stated in *Mackrill*, "[w]e use our inherent power of common-law plain error review sparingly, on a case-by-case basis, and only in the aforementioned circumstances." *Mackrill*, ¶ 48. However, a mere assertion that failure to review the claimed error may result in a manifest miscarriage of justice is not sufficient to implicate the plain error doctrine. *Mackrill*, ¶ 49 (citing M. R. App. P. 12(1)f.).

¶45 Hence, we need not consider this argument further since Cotterell failed to raise or address it in his motions before the District Court.

### C. Warrantless electronic monitoring

¶46 Cotterell argues that, absent a warrant, Anderson's "surreptitious third-party electronic surveillance" and recording of his radio conversations with his son was unlawful. The State argues on the other hand that because the radio traffic listened to and recorded by Anderson was sent over public airways, it in no way involved an expectation of privacy, thus no warrant was required.

15

¶47    The State relies, in part, on our holding in *State v. Brown*, 232 Mont. 1, 755 P.2d 1364 (1988), for its proposition that Anderson did not need a warrant to monitor and record Cotterell's conversations. However, this Court recently overruled *Brown* in *State v. Goetz*, 2008 MT 296, 345 Mont. 421, 191 P.3d 489.

¶48    *Brown* involved both the monitoring and recording of telephone conversations and the monitoring and recording of in-person conversations by the use of a body wire transmitting device, both with the consent of one of the people involved in the conversations. *Brown*, 232 Mont. at 3-4, 755 P.2d at 1366. We held in *Brown* that

> if one party to a telephone conversation freely consents, the conversation can be electronically monitored and recorded without a warrant, and the evidence obtained is admissible in a subsequent criminal trial. This rule remains true even if the consenting party is an informant or a police officer.

*Brown*, 232 Mont. at 7, 755 P.2d at 1368. As to the warrantless consensual monitoring of face-to-face conversations by the use of a body wire, we held in *Brown* that such activity does not violate the right to be free of unreasonable searches and seizures nor the privacy section of the Montana Constitution. *Brown*, 232 Mont. at 8, 755 P.2d at 1369. We again cautioned however, that consent for this type of monitoring "must be clearly obtained from at least one party to the conversation and must be freely made and without compulsion." *Brown*, 232 Mont. at 8, 755 P.2d at 1369.

¶49    *Goetz* also involved the warrantless consensual monitoring of face-to-face conversations by the use of a body wire. However, we concluded in *Goetz* that *Brown* "provides little, if any, guidance in resolving the issue before us in light of the reliance on federal jurisprudence—and limited analysis and application of the provisions of the

16

Montana Constitution—in that case." *Goetz*, ¶ 24. Thus, we overruled *Brown* and examined the issue anew "applying more current and consistent interpretations of Article II, Sections 10 and 11 of the Montana Constitution." *Goetz*, ¶ 24. We then held in *Goetz* that the warrantless electronic monitoring and recording of face-to-face conversations, even with the consent of one participant in the conversation, violates the other participant's rights to privacy and to be free from unreasonable searches and seizures guaranteed by Article II, Sections 10 and 11. *Goetz*, ¶ 54.

¶50 We noted in *Goetz* that our initial inquiry in addressing warrantless electronic monitoring is to determine whether such conduct constitutes a search. *Goetz*, ¶ 25 (citing *State v. Scheetz*, 286 Mont. 41, 46, 950 P.2d 722, 724 (1997)).

> A search is "the use of some means of gathering evidence which infringes upon a person's reasonable expectation of privacy." [*State v.*] *Hardaway*, [2001 MT 252,] ¶ 16 [307 Mont. 139, ¶ 16, 36 P.3d 900, ¶ 16]. "A search occurs when the government infringes upon an individual's expectation of privacy that society considers objectively reasonable." Where no objectively reasonable expectation of privacy exists, a "search" does not occur within the contemplation of Article II, Section 11 of the Montana Constitution. *State v. Hamilton*, 2003 MT 71, ¶ 17, 314 Mont. 507, ¶ 17, 67 P.3d 871, ¶ 17 (citing *Scheetz*, 286 Mont. at 46, 950 P.2d at 725).

*Goetz*, ¶ 25.

¶51 We further noted in *Goetz* that determining whether a state action constitutes an unreasonable or unlawful search or seizure in violation of the Montana Constitution requires an analysis of the following three factors: (1) whether the person challenging the state's action has an actual subjective expectation of privacy; (2) whether society is willing to recognize that subjective expectation as objectively reasonable; and (3) the

nature of the state's intrusion. *Goetz*, ¶ 27 (citing *State v. Hill*, 2004 MT 184, ¶ 24, 322 Mont. 165, ¶ 24, 94 P.3d 752, ¶ 24).

¶52 In the case *sub judice*, Cotterell asserts that he had a reasonable expectation of privacy in the conversations he had with his son over their hand-held radios. On the facts of this case, we reject Cotterell's position. Cotterell and his son engaged in their communications using widely available hand-held radios over a public channel that can be monitored by anyone using similar equipment. Contrary to Cotterell's assertions, these sorts of conversations cannot be considered "private." "Where a person has gone to considerable trouble to keep activities and property away from prying eyes, the person evinces a subjective expectation of privacy in those activities and that property." *Goetz*, ¶ 29 (citing *State v. 1993 Chevrolet Pickup*, 2005 MT 180, ¶ 12, 328 Mont. 10, ¶ 12, 116 P.3d 800, ¶ 12). In this case, rather than keeping his "activities and property away from prying eyes"—or ears, as the case may be—Cotterell actually went to "considerable trouble" to announce his activities using a media that is accessible to any member of the public with commonly available technology.

¶53 Indeed, Anderson testified at the suppression hearing and at trial that he used a scanner to listen to the radio traffic in the area over the family radio-service channel. He also testified that anyone who uses similar equipment which, as he stated, is easily obtained and readily available, can listen to conversations on this channel since the channel is open to the public at large.

¶54 On the evidentiary record here, we cannot conclude that Cotterell demonstrated that he had a subjective expectation of privacy in his radio conversations that society

18

would recognize as reasonable. Indeed, if it was Cotterell's intention to seek privacy in his radio communications with his son, he chose, incongruously, a forum that could not have been more accessible and public. Moreover, knowing that his use of such radio communications in big game hunting is prohibited (*see* ¶ 63, *infra*), it should have come as no surprise to Cotterell that his radio traffic might well have been overheard or monitored by game wardens on patrol during the hunting season.

> [W]hen persons leave the privacy of their home and expose themselves and their effects to the public and its independent powers of perception, it is clear that they cannot expect to preserve the same degree of privacy for themselves or their affairs as they could expect at home.

*Goetz*, ¶ 29 (quoting *State v. Elison*, 2000 MT 288, ¶ 51, 302 Mont. 228, ¶ 51, 14 P.3d 456, ¶ 51).

¶55 Accordingly, we hold, on the facts here, that because Cotterell did not have a reasonable expectation of privacy in the conversations he had with his son over public airways, no search occurred, thus Anderson did not need a warrant to listen to or record those conversations.

### D. Probable cause for search warrant

¶56 Cotterell argues that the information contained in the Application for Search Warrant did not constitute probable cause to indicate that illegal activities were taking place on his property. Hence, he contends that the District Court erred in refusing to suppress the evidence gathered as a result of executing the warrant.

¶57 When considering a probable cause challenge to a search warrant, it is the duty of the reviewing court to ensure that the magistrate issuing the search warrant had a

19

substantial basis for concluding that probable cause to issue the search warrant existed. *Hauge v. District Court*, 2001 MT 255, ¶ 21, 307 Mont. 195, ¶ 21, 36 P.3d 947, ¶ 21 (citing *State v. Oleson*, 1998 MT 130, ¶ 7, 289 Mont. 139, ¶ 7, 959 P.2d 503, ¶ 7, *overruled in part by State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556; *State v. Jensen*, 217 Mont. 272, 276, 704 P.2d 45, 47 (1985)).

¶58 "Probable cause exists when the facts and circumstances presented would warrant an honest belief in the mind of a reasonable and prudent man that the offense has been, or is being, committed and that the property sought exists at the place designated." *Kuneff*, ¶ 22 (quoting *State v. Isom*, 196 Mont. 330, 343, 641 P.2d 417, 424 (1982)) (internal quotation marks omitted). Moreover, we have held that probable cause "must be determined exclusively from the 'four corners' of the search warrant application." *Kuneff*, ¶ 21 (citing *State v. Rinehart*, 262 Mont. 204, 211, 864 P.2d 1219, 1223 (1993)).

¶59 We have repeatedly stated that we will pay great deference to a magistrate's determination that probable cause exists for the issuance of a search warrant and we will draw all reasonable inferences possible to support the issuing magistrate's determination of probable cause. *Hauge*, ¶ 21 (citing *Oleson*, ¶ 8; *Rinehart*, 262 Mont. at 210-11, 864 P.2d at 1223).

¶60 The search warrant application presented the following facts in support of a determination of probable cause:

- On 10/7/2004 [Anderson] received a report that two off-duty Fish Wildlife and Parks employees, Doug Monger and Tom Riley [sic], were flying a plane in the Townsend area. They observed and reported an area with "an enclosed, elevated, tree stand. In front of it is a large Cabela's type tripod feeder and a salt/mineral block." They later

20

produced a diagram of the area that showed the location of the feeder and the tree stand.

- On 10/7/2004, [Anderson] investigated and verified the report by observing the tree stand, several hunting "huts" and several salt/mineral blocks sitting in black trays near hunting stands on the property belonging to Sam Cotterell.

- On 10/23/2004, [Anderson] again observed the tree stand, several hunting "huts" and several salt/mineral blocks sitting in black buckets/trays near the hunting stands on the property belonging to Sam Cotterell.

- On 10/24/2004, the opening day of deer season, on the Cotterell property, [Anderson] observed a hunter leave a "cabin," walk to the baited tree stand, and hunt from the tree stand for several hours. [Anderson] also observed three hunters hunt from a "hunting hut," near a salt/mineral lick, on the Cotterell property. [Anderson] monitored the radio traffic of those hunters that was used to aid in the hunting of game animals. The radio traffic was matched to the hunters on the Cotterell property by the hunter's actions, names, and descriptions of locations.

- The hunters talked about hunting mule deer on the property. [Anderson] checked records and found that none of the hunters have permits to hunt mule deer in hunting district 391, which is the hunting district the Cotterell property is located in.

- On 10/25/2004, [Anderson] observed a hunter walk across a river channel, from the Cotterell property, towards a neighboring island. The hunter walked to a dead whitetail buck deer that was lying in the river several feet from the islands shoreline. The hunter then walked back to the Cotterell property to a eight-wheeled off-highway vehicle that was parked there. The hunter then drove the vehicle across the river channel onto the island. The hunter loaded the un-gutted deer into the vehicle and then drove the vehicle back across the river channel onto the Cotterell property. [Anderson] never saw the hunter put a tag on the deer. To [Anderson's] knowledge, none of the Cotterell's has permission to hunt on the neighboring island where the deer was killed.

- In [Anderson's] experience, hunters will usually take photographs of their hunting activities and their harvested game.

- In [Anderson's] experience, consumers will often have paperwork showing the purchase of, or directions on how to use, products such as game feeders.

- Game feed and salt/mineral blocks that are not being used are usually stored inside a building out of the weather. Game carcasses are also usually stored inside buildings.

- Handheld radios, cameras, and hunting licenses are usually kept on a person or in a vehicle.

¶61 Cotterell contends that this information does not constitute probable cause sufficient to support the search warrant. Along with his allegations of error discussed above regarding the aerial "search" and the electronic monitoring, he argues that tree stands or hunting huts are not an illegal or even a suspicious activity, nor is placing salt blocks and mineral containers for cattle. He also argues that retrieval of a dead buck from the water is not illegal, and that the application makes no statement in support of how the deer was killed, who killed it, or when it was killed. In addition, Cotterell argues that his off-highway vehicle is an amphibious vehicle, designed expressly for the use observed and, that it is licensed as a boat. Hence, Cotterell claims that the law Anderson cites regarding a violation committed with the off-highway vehicle does not apply to amphibious vehicles.

¶62 To address whether sufficient probable cause existed in the application to issue a search warrant, we adopted the "totality of the circumstances" test set forth in the United States Supreme Court's decision in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317 (1983). *Hauge*, ¶ 21; *Kuneff*, ¶ 22.

> "The task of the issuing magistrate is simply to make a practical, common
> sense determination whether, given all the circumstances set forth in the

affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place."

*Kuneff*, ¶ 22 (quoting Gates, 462 U.S. at 238, 103 S. Ct. at 2332). Thus, "[p]robable cause requires a determination that there is a *probability* of criminal activity." *Kuneff*, ¶ 22 (citing *Rinehart*, 262 Mont. at 210, 864 P.2d at 1222) (emphasis added).

¶63 In this case, the facts and circumstances described in the application indicated a fair probability that evidence of a crime existed on Cotterell's property. For example, DFWP regulations prohibit the use of two-way communication devices in hunting big game animals, and, under § 87-1-125, MCA (2003), any person who purposely, knowingly, or negligently violates those regulations is guilty of a misdemeanor. Furthermore, Cotterell is incorrect in arguing that his use of an amphibious vehicle to retrieve a deer from his neighbor's property was not improper. Section 61-8-371, MCA (2003), provides that "a person may not operate a motor vehicle, as defined in 61-1-102, or an off-highway vehicle, as defined in 23-2-801, . . . below the ordinary high-water mark of class I waters flowing through private lands, within that portion of the streambed that is covered with water." Section 23-2-801(1), MCA (2003), defines an "off-highway vehicle" as

> a self-propelled vehicle used for recreation or cross-country travel on public lands, trails, easements, lakes, rivers, or streams. The term includes but is not limited to motorcycles, quadricycles, dune buggies, *amphibious vehicles*, air cushion vehicles, and any other means of land transportation deriving motive power from any source other than muscle or wind. [Emphasis added.]

¶64    Accordingly, we hold that the application for search warrant stated facts sufficient to show probable cause for the issuance of the warrant.

*E. "Overly-broad" search warrant*

¶65    The warrant to search Cotterell's property provided that the following items could be seized if found thereon:

- Automatic game feeders
- Game feeds (such as corn or other grains used in automatic game feeders)
- Salt/mineral block buckets or trays
- Salt/mineral blocks, or other such game attractants
- A six wheeled off-highway vehicle
- Handheld radios
- A buck whitetail deer carcass and other game animal parts and carcasses
- Tree stands, huts, and other devices used in hunting over baits and salt licks
- Film and photographs of hunting activities
- Paperwork having to do with game feeds, feeders, and baiting techniques
- Hunting licenses and permits
- Any other evidence of a crime

In his Motion to Suppress, Cotterell contended that authorizing the seizure of "[a]ny other evidence of a crime" was impermissibly broad and allowed Anderson and his fellow agents to conduct an "unrestricted fishing expedition throughout [his] home." Thus, he argued that the warrant was fatally flawed and must be thrown out. Cotterell further argued that there was nothing in the warrant authorizing the agents to seize Cotterell's journals and calendars.

¶66    In its order denying Cotterell's motion to suppress, the District Court pointed out that while the warrant does contain a "potentially impermissible catch-all phrase," the

24

only items taken from the property which were not specified in the warrant were paperwork in the form of journals and calendars which documented the number of game animals killed on specific dates. The court concluded that such journals and calendars were items which generally would be sought by a game warden in the investigation of hunting violations as they directly relate to the crimes alleged, and, as such, were within the scope of the warrant.

¶67 On appeal, the State concedes that the phrase "any other evidence of a crime" was improperly included in the search warrant. However, the State argues that the seizure of Cotterell's journals and calendars was proper because they related directly to the crimes being investigated. The items at issue show information relating to hunting and fishing, including the time, location, type, and numbers of deer seen or shot, and the type and number of fish caught on particular days.

¶68 We review de novo a district court's legal conclusion on whether or not a search warrant is overly broad. *Hauge*, ¶ 11 (citing *State v. Seader*, 1999 MT 290, ¶ 4, 297 Mont. 60, ¶ 4, 990 P.2d 180, ¶ 4; *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986)).

¶69 We noted in *Hauge* that the Fourth Amendment to the United States Constitution requires that a search warrant particularly describe the place to be searched, and the persons or things to be seized, and that, while Article II, Section 11 of the Montana Constitution does not use the word "particularly" in its discussion of search warrants, we have held that the Montana Constitution does impose a particularity requirement identical to that under the Federal Constitution. *Hauge*, ¶ 13 (citing *State v. Ballew*, 163 Mont.

257, 261, 516 P.2d 1159, 1161-62 (1973)). We also pointed out in *Seader* that § 46-5-221(4), MCA, provides that "[a] judge shall issue a search warrant to a person upon application . . . made under oath or affirmation, that . . . particularly describes who or what is to be seized" and that this requirement of particularity "serves to prevent a 'general, exploratory rummaging in a person's belongings.' " *Seader*, ¶ 11 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038 (1971)).

¶70 The search warrant in *Seader* allowed for the seizure of several specific items along with "proceeds of drug sales whether in monies, precious metals, property or anything else of value furnished or intended to be furnished in the exchange for the evidence or contraband relating to the use, sale or manufacture of dangerous drugs." *Seader*, ¶ 7. We concluded in *Seader* that this language was overly broad because Seader was not suspected of committing the offense of criminal distribution of dangerous drugs or criminal possession with intent to distribute, nor did the search warrant application contain any information that Seader was a suspected drug dealer. *Seader*, ¶ 15. Thus, we held that because the search warrant "gave the officers unbridled discretion to engage in precisely what the particularity requirement seeks to prevent—a general, exploratory rummaging in Seader's belongings," *Seader*, ¶ 14, "[t]he phrase 'anything else of value' rendered the warrant facially overbroad and all evidence seized pursuant to it was inadmissible and should have been suppressed," *Seader*, ¶ 16.

¶71 Similarly, the search warrant in *Hauge* authorized law enforcement officers to seize drugs, drug paraphernalia, records of drug transactions, weapons, and

[p]roceeds of dangerous drug sales to include United States currency, precious metals, jewelry, and financial instruments, including but not limited to stocks and bonds, real property, or *anything else of value* furnished or intended to be furnished in the exchange of controlled substances in violation of Title 45, chapter 9, MCA.

*Hauge*, ¶ 7 (emphasis added). Unlike the facts in *Seader*, however, the law enforcement officers in *Hauge* did not seize any property related to the catchall clause in the search warrant, nor did any criminal charges result from the presence of that language in the warrant. On that basis we held that "when faced with a warrant that is lawfully issued and is otherwise sufficiently particularized, the overbroad catchall clause should be severed and only that evidence seized under that clause need be suppressed." *Hauge*, ¶ 19.

¶72     In addition, we stated in *State v. Loh*, 275 Mont. 460, 473, 914 P.2d 592, 600 (1996), that

[t]he essential predicate to any valid warrantless seizure of incriminating evidence is that the officer must be lawfully at the place from which he could plainly view the evidence. In other words, his initial entry onto or intrusion into the place where he views the evidence must not have been in violation of the Fourth Amendment or in violation of Article II, section 11 of Montana's Constitution.

We further stated in *Loh* that

there are two conditions that must be satisfied to justify the warrantless seizure under the plain view doctrine. First, the item must be in plain view and its incriminating character be "immediately apparent." Second, not only must the officer be lawfully located in a place from which the object can be plainly seen but he or she must also have a lawful right of access to the object itself.

*Loh*, 275 Mont. at 473, 914 P.2d at 600 (citing *Horton v. California*, 496 U.S. 128, 136-37, 110 S. Ct. 2301, 2307-08 (1990)).

¶73 In the case *sub judice*, we agree with the District Court that the journals and calendars seized from Cotterell's residence were items which generally would be sought by a game warden in the investigation of hunting violations as they directly relate to the crimes alleged. First, Anderson and the other officers were on Cotterell's property by virtue of a validly executed search warrant. Second, the officers discovered the journal and calendars in places that they were allowed by the warrant to search—i.e., the hunting shack and cabin. And, third, the journal and calendars were found in the course of looking for items such as photographs, paperwork, and permits, all of which were specifically set out in the warrant.

¶74 Accordingly, we hold that even after the phrase "any other evidence of a crime" is excised from the search warrant, the journals and calendars were evidence seized within the scope of the warrant since they related to the activities of hunting and fishing.

*F. Conclusion*

¶75 Based on all of the foregoing, we hold that the District Court did not err in denying Cotterell's Motion to Suppress.

**Issue 2.**

¶76 *Whether the District Court erred in denying Cottrell's Motion to Dismiss.*

¶77 Cotterell filed his Brief in Support of Motion to Dismiss on January 22, 2007,[1] just one week prior to trial. In his brief, Cotterell claimed that he was charged several times for taking or possessing the same game animal in violation of the prohibition against double jeopardy. The District Court denied Cotterell's motion concluding that it was

---

[1] Cotterell failed to file the Motion to Dismiss itself until January 25, 2007.

without merit.  The court also noted that the motion was untimely and should have been filed "months ago."

¶78    Title 46, chapter 13, MCA, sets forth certain timing requirements for filing pretrial motions.  Most relevant to the facts in the instant case is § 46-13-101, MCA, which provides, in pertinent part:

> **Pretrial motions and notices.**  (1) Except for good cause shown, any defense, objection, or request that is capable of determination without trial of the general issue *must be raised at or before the omnibus hearing* unless otherwise provided by Title 46.  [Emphasis added.]

Moreover, § 46-13-110(3), MCA, provides that at the omnibus hearing, the prosecutor and defendant's counsel

> must be prepared to discuss any pretrial matter appropriate to the case, including but not limited to:
>
> .   .   .
>
> (b) double jeopardy . . . .

¶79    The purpose behind requiring pretrial motions to be brought at or before the omnibus hearing is the " 'orderly and fair administration of the criminal justice system itself.' "  *State v. VonBergen*, 2003 MT 265, ¶ 16, 317 Mont. 445, ¶ 16, 77 P.3d 537, ¶ 16 (quoting *United States v. Sisca*, 503 F.2d 1337, 1349 (2d Cir. 1974)).   In addition, § 46-13-110(2), MCA, states that the purpose of the omnibus hearing "is to expedite the procedures leading up to the trial of the defendant."

¶80    The omnibus hearing in this case was held on September 23, 2005.  The only issues raised by Cotterell at the omnibus hearing related to the suppression of evidence.  Moreover, he was required to file any additional motions by October 7, 2005.  Because

29

the double jeopardy issue Cotterell raised in his Motion to Dismiss (almost 16 months after the omnibus hearing) was "capable of determination without trial of the general issue," it should have been raised at or before the omnibus hearing pursuant to § 46-13-101(1), MCA. Cotterell has not demonstrated good cause why he failed to do so. "Failure of a party to raise defenses or objections or to make requests that must be made prior to trial, at the time set by the court, constitutes a waiver of the defense, objection, or request." Section 46-13-101(2), MCA.

¶81 Accordingly, we hold that the District Court did not err in denying Cotterell's Motion to Dismiss.

**Issue 3.**

¶82 *Whether the District Court erred in its interpretation of the provisions of § 87-1-102(2)(b), MCA (2003), at sentencing.*

¶83 Along with his convictions for killing more than the legal limit of game animals, hunting without a license, and using two-way communication devices while hunting, Cotterell was convicted of two misdemeanor counts of possessing unlawfully killed game animals. For these two violations, the District Court suspended Cotterell's hunting, fishing and trapping privileges for a period of two years from the date of conviction.

¶84 While Cotterell concedes that the District Court was obligated to impose such a restriction, he contends that the court mistakenly underestimated its authority to suspend the forfeiture with appropriate conditions. However, Cotterell cites no authority in support of his claim that this portion of his sentence may be suspended.

30

¶85     In *State v. Herd*, 2004 MT 85, 320 Mont. 490, 87 P.3d 1017, we clarified our standard of review for criminal sentences. We held in that case that if the offender is eligible for sentence review, i.e., if the offender is sentenced to one year or more of actual incarceration—we will review such a sentence for legality only. *Herd*, ¶ 22. If, however, the offender is statutorily ineligible for sentence review, then we will utilize the two-tiered approach which we employed prior to the creation of the Sentence Review Division (SRD), i.e., we will review such sentences for both legality and abuse of discretion. *Herd*, ¶ 22.

¶86     In the instant case, Cotterell is not eligible for sentence review before the SRD because he was sentenced to concurrent sentences of six months in the county jail on each count, with all time suspended. *See State ex rel. Holt v. District Court*, 2000 MT 142, ¶ 6, 300 Mont. 35, ¶ 6, 3 P.3d 608, ¶ 6 (citing § 46-18-903, MCA). Thus, we employ the two-tiered standard of review in this case.

¶87     First, we review Cotterell's sentence to determine whether it falls within the parameters of the sentencing statute. Section 87-1-102, MCA (2003), the penalty statute for violations under this Title, provides in pertinent part:

> (2)(b) Except as provided in subsection (2)(f), a person convicted of unlawfully taking, killing, possessing, or transporting a deer, antelope, elk, or mountain lion or any part of these animals shall be fined an amount not less than $300 or more than $1,000 or imprisoned in the county detention center for not more than 6 months, or both. In addition, that person, upon conviction or forfeiture of bond or bail, *shall forfeit* any current hunting, fishing, or trapping license issued by this state and the privilege to hunt, fish, or trap in this state *for 24 months* from the date of conviction or forfeiture, *unless the court imposes a longer forfeiture period*. [Emphasis added.]

¶88 Clearly, § 87-1-102(2)(b), MCA, mandates that a person convicted under this statute "shall forfeit" their license for 24 months. There is no provision in the statute allowing the court to suspend all or a part of that forfeiture. In fact, § 87-1-102(4), MCA (2003), specifically provides that a person whose license privileges are forfeited may not *possess* a hunting, fishing or trapping license during the period in which the license privileges have been forfeited. To do so would subject the person to additional fines and penalties. Consequently, the District Court's imposition of license forfeiture for 24 months without any suspension of the forfeiture period is within the parameters of the statute.

¶89 Next, we examine whether the District Court abused its discretion in not suspending all or a portion of the 24-month forfeiture period under the facts of this case. An abuse of discretion occurs when a district court acts arbitrarily without conscientious judgment or exceeds the bounds of reason. *State v. Ruiz*, 2005 MT 117, ¶ 22, 327 Mont. 109, ¶ 22, 112 P.3d 1001, ¶ 22 (citing *State v. Grindheim*, 2004 MT 311, ¶ 16, 323 Mont. 519, ¶ 16, 101 P.3d 267, ¶ 16). As already noted, there is no provision in the statute allowing the court to suspend all or a part of the license forfeiture. The only discretion afforded the court by § 87-1-102(2)(b), MCA, is whether to impose a *longer* forfeiture period, which the court did not do in this case. Thus, we cannot conclude that the court acted arbitrarily without conscientious judgment or exceeded the bounds of reason. Furthermore, "[i]n the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Based on

the foregoing, we hold that the District Court did not abuse its discretion in not suspending the forfeiture period.

¶90    Cotterell also argues that the District Court erred in refusing to sever Cotterell's fishing privileges from the forfeiture of his hunting privileges because there is an insufficient nexus between his fishing privileges and the convicted offenses. As with his claim that all or part of the 24-month forfeiture period for his license may be suspended, Cotterell cites no authority in support of his claim that the court could sever his fishing privileges from his hunting privileges and only require that he forfeit his hunting privileges.

¶91    Section 87-1-102(2)(b), MCA (2003), provides that "a person convicted of unlawfully taking, killing, possessing, or transporting *a deer, antelope, elk, or mountain lion* or any part of these animals . . . shall forfeit any current hunting, *fishing*, or trapping license issued by this state (emphasis added)." Thus, under this statute, the forfeiture of fishing privileges is not tied to a violation of any privileges regarding fishing. Instead, the forfeiture of fishing privileges, along with the forfeiture of hunting and trapping privileges, is specifically tied to the offenses for which Cotterell was charged and convicted. As such, the District Court's imposition of forfeiture of Cotterell's fishing privileges is within the parameters of the statute. Additionally, § 87-1-102(2)(b), MCA, does not afford the court any discretion to sever Cotterell's fishing privileges from his hunting and trapping privileges.

¶92    Accordingly, we hold that the District Court did not err in its interpretation of the provisions of § 87-1-102(2)(b), MCA (2003), at sentencing.

¶93 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ JIM RICE